592 A.2d 55

**In the Interest of R.T. and A.T., Minor Children.**

**Appeal of C.H., Sr., E.R.H. and J.J. and K.J., Appellants.**

Superior Court of Pennsylvania.

Argued October 17, 1990.

Filed May 28, 1991.

Cynthia Cline, Uniontown, for appellants.

Anthony Dedola, Uniontown, for Children and Youth Services, participating party.

Before ROWLEY, WIEAND and FORD ELLIOTT, JJ.

FORD ELLIOTT, Judge:

This is an appeal from an order adjudicating R.T. a dependent child and A.T. a dependent and abused child. The children were placed in the care, custody and control of the Fayette County Children and Youth Services for foster home placement. Appellants in this matter are the children's maternal grandparents and maternal aunt and uncle.[1] The natural father has not filed a brief in this case, and the natural mother is deceased. The agency has filed a brief in support of the trial court's order. As appellants contend that the trial court abused its discretion in this matter, and we have reviewed the record, the briefs and the applicable law, we agree that the trial court abused its discretion in adjudging the children dependent and therefore, reverse.

The tragic tale of R.T.'s, age eight, and A.T.'s, age six, circumstances began on January 7, 1990, when their natural mother, J.T., was murdered by their natural father, R.T., Sr., as she slept in the family's mobile home. The children were present in the home when the murder took place. As R.T., Sr. was taken into police custody, the maternal grandparents and a maternal aunt and uncle, K.J. and J.J., took custody of the children. On January 22, 1990, appellants were granted temporary custody and guardianship of R.T.

---

1. As appellants had temporary custody of A.T. and R.T., we find that they have standing to appeal to this court. *In re Davis*, 502 Pa. 110, 465 A.2d 614 (1983).

and A.T. by an order of court. Due to the proximity of the maternal grandparents' home to the murder site, R.T. and A.T. resided with their maternal aunt and uncle along with their two boy cousins, ages eight and nine. However, they visited their grandparents twice a week and usually were accompanied by their cousins. During their stay with their aunt and uncle, R.T. and A.T. shared a bedroom and their cousins shared an adjacent bedroom. Both bedrooms were situated above the bedroom of the aunt and uncle. As the uncle was a light sleeper, he contended that he could hear all activities in the children's bedrooms.

While living with their aunt and uncle, R.T. and A.T. attended church and Sunday school, showed improvement in their school work, participated in family outings of roller skating and hiking, and R.T. joined the cub scouts. Due to R.T.'s and A.T.'s presence in their home, K.J. quit her job so that she could care for the children and J.J. took a new ministry with the Fairchance Free Methodist Church to supplement their income.

Initially, R.T. and A.T. experienced distress due to their fear of their father shooting them. Also during this time, the maternal aunt noticed A.T.'s frequent urination and complaints about her "private parts" being sore. Within a few days of A.T. being taken off soda pop, the urination problem dissipated, but the redness surrounding A.T.'s vaginal area did not. A.T. explained the redness was caused by "daddy's belt buckle."

In conjunction with R.T. and A.T. resuming their school attendance, and in an effort to help them cope with their mother's death, their aunt and uncle took them to Chestnut Ridge Counseling Services. The children were seen by a therapist, John Connors. During one of the children's visits with Mr. Connors, the aunt and uncle discussed their suspicion of possible sexual abuse. At the advice of Mr. Connors and their attorney, K.J. and J.J. did not report the alleged sexual abuse to Children and Youth Services because of concern for the trauma the children already had experienced.

On February 27, 1990, in anticipation of a full custody hearing with the natural father, the maternal aunt, K.J., and the maternal grandmother took R.T. and A.T. to Children's Hospital of Pittsburgh for an evaluation and examination. During her evaluation, A.T. disclosed that she had had sexual contact with her brother, R.T., and her two boy cousins while living in the home of her maternal aunt and uncle. Upon her physical examination, A.T. displayed redness and swelling in her vaginal area as well as chronic and repeated abuse of rectal penetration. Due to these findings, Children's Hospital contacted the Fayette County Children and Youth Services, CYS, which started an immediate investigation of the matter.

Ms. Traci Mari, the CYS caseworker, interviewed A.T. the following day about the sexual abuse. At this time, A.T. excluded any contact with her brother, R.T., and disclosed that she had engaged in sexual behavior only with her cousins. However, the behavior that A.T. described that took place between her and her cousins could not have included anal penetration as A.T. described, due to the boys being unable anatomically to perform such acts. R.T. at this time did not discuss any such behavior with Ms. Mari as he made no disclosures.

Subsequently on March 1, 1990, CYS filed a petition declaring A.T. a dependent and abused child and R.T. a dependent child thereby seeking temporary custody of the children until a hearing could be held on the matter. The trial court granted the CYS petition and conducted a hearing on March 20, 1990. The court heard testimony from Ms. Traci Mari, Dr. Casrasco, the treating physician at Children's Hospital, the maternal aunt and uncle as well as the maternal grandfather and grandmother. On March 23, 1990, the trial court adjudicated R.T. a dependent child and A.T. a dependent and abused child. The trial court ordered that the Fayette County Children and Youth Services take the children into its care, custody, and control for foster home placement.

Appellants filed their notice of appeal on April 16, 1990. The following day the trial court ordered appellants to file a concise statement of the matters complained of on appeal. Appellants complied with the trial court order on April 30, 1990, and on May 25, 1990, the trial court filed its Pa.R.A.P. 1925 opinion. During oral argument in this matter, it was reported that the trial court entered an order on August 28, 1990, placing the children, R.T. and A.T., in the home of another maternal aunt in New York.

Appellants raise the following issues for our review:

I. Did the lower court err as a matter of law and abuse its discretion in finding that the Fayette County Children and Youth Service proved by clear and convincing evidence that [A.T.] was a dependent and abused child and that she should be removed from the custody the [Js]' and of [Hs']?

II. Did the lower court err as a matter of law and abuse its discretion in finding that the Fayette County Children and Youth Service proved by clear and convincing evidence that [R.T., Jr.] was dependent and should be removed from the care of the [Hs'] and [Js']?

III. Did the lower court err as a matter of law and abuse its discretion in finding that Children and Youth Service utilized reasonable efforts in investigating the case before the court and that it used reasonable efforts in preventing the placement of both children in foster care?

IV. Did the lower court err as a matter of law and abuse its discretion in refusing to permit appellants to call character witnesses on their behalf?

V. Did the lower court err and abuse its discretion by ex parte continuing the initial hearing set in this matter without notice to appellants or to counsel for appellant?

Due to our disposition of appellant's first and second arguments, we need not address the remaining issues in this case.

In *In re Frank W.D.*, 315 Pa.Super. 510, 517, 462 A.2d 708, 711 (1983), we stated our standard of review as follows:

[t]he standard of review which this Court employs in cases of dependency is broad. *In Re Custody of Neal*, 260 Pa.Super. 151, 393 A.2d 1057 (1978). However, the scope of our review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977). We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. *In Re Interest of Black*, 273 Pa.Super. 536, 417 A.2d 1178 (1980); *In Re Kunkle*, 265 Pa.Super. 605, 402 A.2d 1037 (1979). Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence. *Commonwealth ex rel. Morales v. Morales*, 222 Pa.Super. 373, 294 A.2d 782 (1972).

Moreover,

[i]n reviewing an adjudication of dependency, we are guided by the manifest intent of the legislature in drafting the Juvenile Act, which was to preserve unity of the family whenever possible. 42 Pa.C.S.A. § 6301(b)(1). *In Re Interest of Ryan Michael, C.*, 294 Pa.Super. 417, 440 A.2d 535 (1982). Consequently, a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available. *In Re LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976). A court may not find a child to be dependent absent clear and convincing evidence. 42 Pa.C.S.A. § 6341(c). This standard has been defined as *testimony that is so direct and unambiguous as to enable the trier of fact to come to a sure determination, without conjecture, of the truth of the exact facts at issue. Matter of Jackson*, 302 Pa.Super. 369, 374, 448 A.2d 1087,

1089 (1982); *In Re Jackson,* 267 Pa.Super. 428, 406 A.2d 1116 (1979).

*Id.* (Emphasis added). However, before we can review effectively a dependency adjudication premised on abuse, we need to reflect upon the interaction between the Juvenile Act and the Child Protective Services Law.

Initially, it must be noted that the primary purpose of the Juvenile Act is to preserve the family unity whenever possible 42 Pa.C.S. § 6301(b); *In the Interest of Ryan, Michael C.,* 294 Pa.Super. 417, 440 A.2d 535 (1982). Only upon allegations of dependency or delinquency are the provisions and procedures set forth in the Juvenile Act applicable. 42 Pa.C.S. § 6303. Our legislature has defined a dependent child as "a child who is without proper parental care or control, subsistence, education as required by law, *or other care or control necessary for his physical, mental, or emotional health or morals."* 42 Pa.C.S. § 6302(1). (Emphasis added). As noted above, the Juvenile Act will permit a finding of dependency only upon clear and convincing evidence. 42 Pa.C.S. § 6341(c). Thus, if clear and convincing evidence has not been presented to the court, then the court must "dismiss the petition and order the child discharged from any detention or other protection theretofore ordered in the proceeding." 42 Pa.C.S. § 6341(a). However, upon a clear and convincing finding of dependency the court must order a disposition of the child within the provisions of 42 Pa.C.S. § 6351(a). It provides:

(a) General rule.—If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child:

(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child.

(3) Without making any of the foregoing orders transfer custody of the child to the juvenile court of another state if authorized by and in accordance with section 6363 (relating to ordering foreign supervision.

The Child Protective Services Law, CPSL, is a complement to the Juvenile Act. Its purpose is "to facilitate the protection of abused children, and to preserve and stabilize the family life of abused children" *In the Interest of Justin, S.,* 375 Pa.Super. 88, 97, 543 A.2d 1192, 1196 (1988). In fact, 11 P.S. § 2202 [2] fully expresses the purpose of the CPSL as:

[a]bused children are in urgent need of an effective child protective service to prevent them from suffering further injury and impairment. It is the purpose of this act to encourage more complete reporting of suspected child abuse and to establish in each county a child protective service capable of investigating such reports swiftly and competently, providing protection for children from further abuse and providing rehabilitative services for children and parents involved so as to ensure the child's well-being and to preserve and stabilize family life wherever appropriate. However, nothing in this act shall be con-

2. The Child Protective Services Law, 11 P.S. § 2201–2224, was repealed by Act of December 19, 1990, and reenacted as Part VII of the Domestic Relations Code, 1990, December 19, P.L. 1240, No. 206, § 2. *See* 23 Pa.C.S.A. § 6301–6384 (Purdon Supp.1991). As the arguments before this court were premised on the former statute, we believe that our holding is unaffected by the statute's repeal and reenactment. 1 Pa.C.S.A. § 1962 (Purdon Supp.1991).

strued to restrict the generally recognized existing rights of parents to use reasonable supervision and control when raising their children.

The CPSL has defined child abuse as meaning:

serious physical or mental injury which is not explained by the available medical history as being accidental, or sexual abuse or sexual exploitation, or serious physical neglect, of a child under 18 years of age, if the injury, abuse or neglect has been caused by the acts or omissions of the child's parents or by a person responsible for the child's welfare, or any individual residing in the same home as the child, or a paramour of the child's parent provided, however, no child shall be deemed to be physically or mentally abused for the sole reason he is in good faith being furnished treatment by spiritual means through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof or is not provided specified medical treatment in the practice of religious beliefs, or solely on the grounds of environmental factors which are beyond the control of the person responsible for the child's welfare such as inadequate housing, furnishings, income, clothing and medical care.

11 P.S. § 2203. Also, the CPSL requires that the court appoint a guardian *ad litem* for the child when a proceeding has been initiated alleging child abuse. 11 P.S. § 2223. Although CPSL hearings are generally governed by the procedures and evidentiary rules of the Juvenile Act, the CPSL itself provides for additional rules of evidence to govern in child abuse proceedings in juvenile or family court. 11 P.S. § 2222. Moreover, upon petition from a guardian *ad litem* the court in a CPSL proceeding can order appropriate protective services for a child in need or terminate or alter the condition of any placement, temporary or permanent, of the child. 11 P.S. § 2223.

Even though the Juvenile Act and the CPSL are complementary in nature, neither of the acts provide for an independent action of "abuse." *In the Interest of Justin,*

*S., supra; In the Interest of R.M.R.*, 366 Pa.Super. 243, 530 A.2d 1381 (1987); *In the Interest of M.B.*, 356 Pa.Super. 257, 514 A.2d 599 (1986) affirmed *per curiam* 517 Pa. 459, 538 A.2d 495 (1988). In fact, "we have held that CPSL does not create or include a separate action for child abuse, and, under the Juvenile Act, a finding of abuse can only be made as a part of [a] dependency proceeding in which abuse is alleged." *In the Interest of Justin, S., supra*, 375 Pa.Super. at 98, 543 A.2d at 1197, citing *In the Interest of R.M.R., supra.* In *In the Interest of M.B., supra*, 356 Pa.Super. at 260, 514 A.2d at 601, we stated:

> [t]he issues before the Court in an abuse and dependency proceeding are distinct. The proof and argument on one would not necessarily match the proof and argument for the other. In an abuse case, the evidence revolves around the alleged incident of abuse, and the decision which must be reached is whether that evidence meets the standard defined in the Child Protective Services Law.
>
> On the other hand, a dependency proceeding focuses on whether the child at the time of the proceeding is without proper parental care or control....

Therefore, even though "abuse is alleged as a part of a dependency proceeding, [and] a court's finding of 'abuse' as defined by the CPSL would be sufficient evidence under most circumstances to support an adjudication of dependency," it is not determinative in adjudicating a child dependent. *In the Interest of Justin, S., supra*, 375 Pa.Super. at 103, 543 A.2d at 1199. The evidentiary burden for a finding of abuse is less stringent under the CPSL due to the need for immediate intervention for protection of the child. However, as discussed above, under the Juvenile Act the court in a dependency hearing must make a further determination by clear and convincing evidence that the abused child is presently without proper care and control necessary for physical, mental, or emotional health or morals. 11 P.S. § 2222; *In the Interest of R.M.R., supra;* 42 Pa.C.S. § 6302(1).

■ We agree with the trial court's finding, as do appellants, that A.T. unquestionably is an abused child. Dr. Casrasco's testimony is unequivocal in that A.T. has suffered chronic and severe symptoms of rectal penetration. However, we disagree with the trial court's finding that clear and convincing evidence exists that A.T.'s abuse occurred while in appellants' custody, thus leading to a finding of dependency.

The trial court gave great weight to A.T.'s testimony that sexual activity occurred between her and her boy cousins. However, even as related by the trial court, A.T.'s disclosures concerning her abuse have changed many times. Initially, A.T. implicated her brother R.T. and her cousins. Later, she excluded her brother. And then, even later, she disclosed that the sexual behavior occurred a long time ago in her parent's trailer before her mother's death. In fact, A.T. explained the source of the redness surrounding her vagina as "daddy's belt buckle." Moreover, when A.T.'s cousins were evaluated at Children's Hospital following A.T.'s examination, they were found to be well-adjusted boys who spoke openly and freely and were assessed as not likely to have committed the abuse perpetrated on A.T. Additionally, medical testimony established that the ages of the two cousins would indicate that they were unable anatomically to have perpetrated the certain acts which constituted the abuse. Finally, at oral argument before this court, CYS stated its belief that A.T. suffered the sexual abuse at the hands of her natural father, R.T., Sr.

The trial court further based its determination of dependency on the fact that the delay in reporting the abuse to CYS by appellants represented inaction on their part thereby supporting a finding that A.T. did not, and would not, receive the special services needed to address her abuse. Trial court opinion, 5/25/90 at 13. Initially, we note the short span of time, a mere seven weeks, from the murder of the children's mother to the referral to CYS by Children's Hospital. Recognizing that the entire family was in a crisis of-sorts following the murder of J.T.—having lost a daugh-

ter, a sister, or a parent, we cannot agree that the circumstances surrounding the delay in reporting in this case represented inaction. K.J. and J.J., the maternal aunt and uncle, initiated the discussion on the abuse issue by taking the children to Chestnut Ridge Counseling Services. While at Chestnut Ridge, the children were seen by two staff members for evaluation and therapy. K.J. and J.J. were advised at that time by the counselor and their attorney, not to report any of their concerns to CYS due to the trauma the children already had suffered. Also, once the children were taken by CYS, the aunt and uncle endeavored to insure that the children continued with their counseling at Chestnut Ridge. In addition, the aunt and the grandmother initiated the examination at Children's Hospital which uncovered the extent of the abuse. The testimony indicates that this was done in anticipation of a custody hearing involving the children's father. Also, once A.T. made the allegations involving her cousins, it was K.J. and J.J., although expressing disbelief regarding the incidents, who insisted that their two boys be examined at Children's Hospital.

Finally, we need to address the trial court's very legitimate concern that A.T. and R.T. should have been adjudicated dependent based merely on the fact that A.T. had suffered abuse and the perpetrator had not been identified. Both the trial court and Children and Youth Services rely upon *In the Interest of Justin S., supra,* to support the proposition that a child can be found dependent even though the perpetrator has not been identified. However, we find *In the Interest of Justin, S., supra,* distinguishable from the instant case. First of all, *In Re Justin S., supra,* concerned a determination of abuse and thereafter a change of custody to a non-custodial parent without an initial determination of dependency. It was uncontraverted that the abused child was in the custody of his mother and her paramour the entire period in which the abuse could have occurred. Further, the court had narrowed the list of potential perpetrators of the abuse to someone in the moth-

er's household. Finally, the child victim's brother in this case had reported to the court-appointed psychologist that his mother knew that her paramour had physically abused his brother, but that she had not reported this to the court.

Contrary to *Justin, S.*, the testimony in the instant case reflects that A.T.'s symptoms of assault indicated that the assaults perpetrated upon her could have ended as early as a year before her examination at Children's Hospital. In fact, Dr. Casrasco's testimony reveals that it is highly unlikely that the abuse occurred solely within the mere seven weeks appellants had custody of A.T. Finally, as noted above and contrary to the trial court's conclusion, we can find no clear and convincing evidence based on this record, that the unknown perpetrator who inflicted the rectal injuries on A.T. resided in appellants' households.

This court is very cognizant of the tremendous burden placed on the trial court in this case. The court had before it clear evidence that a child had been abused and having no clear indication as to who the abuser was, it exercised its best judgment and erred in favor of protecting both A.T. and R.T. However, we are constrained to decide this case as we do today based upon our careful and exhaustive examination of the record, and our inability to find "testimony that is so direct and unambiguous as to enable the [trial court] to come to a sure determination, without conjecture of the truth of the exact facts at issue" so as to have adjudicated A.T. a dependent child. *See In re Frank W.D., supra,* 315 Pa.Super. at 516, 462 A.2d at 711. Also, as the record is devoid of any clear and convincing evidence of abuse or dependency on part of R.T., and a child should not be found dependent simply because his siblings are, we cannot uphold the trial court's adjudication of R.T. as a dependent child. *See In the Interest of Theresa, E.,* 287 Pa.Super. 162, 429 A.2d 1150 (1981).

Based on the foregoing, we reverse the trial court's adjudication of dependency in regard to A.T. and R.T. Further, based on the record presently before this court we find no clear and convincing evidence of sexual abuse of

A.T. and R.T. occurring while in appellants' custody. However, A.T. is undeniably an abused child and subject to protection in our courts. On remand, CYS should update its investigation as to the identity of A.T.'s abuser, and present any new evidence to the court if necessary consistent with its responsibilities under the CPSL. Although we have reversed the trial court's order adjudicating A.T. and R.T. dependent children, our order is in no way a permanent order in regard to their present custodial arrangement. "[I]n the interest of safeguarding the permanent welfare of the child, decrees concerning children are temporary and subject to modification to meet changing conditions." *In the Interest of Black,* 273 Pa.Super. 536, 549, 417 A.2d 1178, 1185 (1980); *In re Frank W.D., supra.*

Accordingly, we remand for a custody proceeding in order to determine the best interests and welfare of the children involved herein. Jurisdiction relinquished.

Reversed.

ROWLEY, J., files a concurring statement.

ROWLEY, Judge, concurring:

I concur in the majority's decision to reverse the adjudication of dependency but write separately to address aspects of the majority's decision, involving both analysis and result, in which I respectfully decline to join.

With regard to the analysis of the merits, I am principally concerned with the majority's apparent rejection of the allegations that A.T., who was six years old during the events in question, engaged in sexual activity with her brother, then age eight, and their male cousins, then ages nine and eight. To clarify my concerns, it is regrettably necessary that those allegations be examined in some detail.

On January 7, 1990, the father of A.T. and R.T. murdered the children's mother. K.J., the children's maternal aunt, and her husband, J.J., who are the parents of the cousins mentioned above, immediately took A.T. and R.T. into their home. By order of court entered January 22, 1990, the

children's aunt and uncle, together with the children's maternal grandparents, C.H., Sr. and E.R.H., were granted temporary custody and guardianship of the children.

K.J., the children's aunt, testified that immediately after she took A.T. into her home, A.T. complained that her private area was sore. Examining the area, K.J. observed "[s]ome redness basically" (N.T. at 54). A.T.'s explanation was that "daddy's belt buckle hurt me" (N.T. at 54). On February 27, 1990, almost two months later, A.T. was examined by Dr. Mary Carrasco, a pediatrician and director of the Family Intervention Center at Children's Hospital. During an examination of the child's vaginal area, Dr. Carrasco observed that the hymenal tissue was swollen and reddened. The condition did not appear to be the type of normal irritation that might result from poor hygiene, Dr. Carrasco testified, and it was possible but unlikely that the condition had been caused by masturbation.

According to Dr. Carrasco, when she asked A.T. when she had last been touched in that area, A.T. replied that she thought it had been the previous night. Dr. Carrasco explained that the child's response was consistent with what she had said when interviewed earlier by Dr. Marcy Gerson, a staff psychologist. A.T. told Dr. Carrasco that her brother and her cousins had touched her in the vaginal area, that both cousins had attempted vaginal intercourse with her, and that one of the cousins had penetrated her rectally. As related by Dr. Carrasco, A.T. had also told Dr. Gerson that such activity had occurred more than once. In Dr. Carrasco's opinion A.T. had recently been subjected to some sort of touching in the vaginal area. Dr. Carrasco also stated that "I would doubt that there was penetration by an adult size penis, but I cannot tell whether there would have been penetration or irritation of that general area" (N.T. at 21).[1]

The physical examination also revealed that, in Dr. Carrasco's opinion, A.T. had been subjected to "long-term,

---

1. Dr. Carrasco testified in a videotaped deposition. The transcript of her testimony is numbered separately from that of the adjudicatory hearing.

chronic ... penetration of the rectal area" (N.T. at 6). It was unlikely that this abuse had ended more than one year ago, Dr. Carrasco testified, because if that had been the case the rectal muscles, the dilation of which was "quite unusual" (N.T. at 6), would have begun to regain normal tone. Dr. Carrasco explained that although she had seen no evidence of recent penetration, the absence of evidence did not mean that such penetration had not occurred. Also noted by Dr. Carrasco was an irregularity of the rectal opening which would have been caused by trauma and which had to have been more than three or four weeks old. Dr. Carrasco offered the opinion that it was possible but highly unlikely that this abuse had only begun in January of that year. She was also of the opinion that the rectal abuse could not have been committed by a pre-pubescent male "[u]nless they were inserting a foreign object, which is not a history we got" (N.T. at 23).

With regard to A.T.'s statements concerning the vaginal touching, Dr. Carrasco testified that "I found her disclosure to be very credible. She was very spontaneous" (N.T. at 30). This was not true, however, with regard to A.T.'s denial that she had ever been subjected to touching in the rectal area; Dr. Carrasco stated that "[s]he said no to me with a perfectly straight face, but I didn't believe her because of the physical evidence I saw" (N.T. at 41). Dr. Carrasco related the views of other staff members who had interviewed A.T.'s cousins and brother: the cousins were seen as open and well adjusted, and R.T. "vehemently denied" (N.T. at 32) the allegations of sexual abuse.

Tracy Mari, a caseworker for Fayette County Children and Youth Services, testified that on February 27, 1990, she received a report, the source of which she was not permitted to disclose, that A.T. had been subjected to sexual abuse in the home of her aunt and uncle. The report implicated A.T.'s brother and cousins and indicated that A.T. had been touched in her vaginal area the night before. During the course of an interview with Ms. Mari the following day, A.T. gave a description of sexual activity between herself

and her cousins that was very similar to that given to Dr. Carrasco. A.T. also said that although her brother and her cousins were "stripping and kissing naked" (N.T. at 20), she touched her cousins' private parts but not her brother's. A.T. told Ms. Mari that "the incidents occurred alot [sic] of times up in the [cousins'] room ..." (N.T. at 21). She did not say whether force was involved, nor did she specify who had initiated the sexual contact. Ms. Mari also interviewed R.T., who refused to talk about anything related to physical or sexual abuse.

On March 1, 1990, CYS obtained temporary custody of A.T. and R.T., and they were placed in foster care. On March 15, 1990, Ms. Mari interviewed A.T. a second time and was told

[t]hat the sex occurred at her trailer in Smithfield, prior to her mothers' [sic] death, and not her aunt's house. She stated that it happened a long time ago when they were little, and not recently. She implicated [her cousins], but not [R.T.]. And she would not go into detail as to what happened.

N.T. at 22–23. When Ms. Mari asked her why she had changed her story, A.T. replied "that she would not be able to go back to her aunt's house" (N.T. at 23). In Ms. Mari's opinion A.T. was then under a lot of pressure and "[was] going to say anything that she can to get back [to her aunt's house]" (N.T. at 10). Ms. Mari expressed the belief that A.T. had been sexually assaulted by an adult and "that she has been engaging in sexual activities with her cousins. I am not sure if she is covering up for her brother because she wants to protect him or not, but I do believe that some type of sexual activities have occurred between the four of them" (N.T. at 37).

Having heard the testimony of Dr. Carrasco and Ms. Mari, as well as that of the maternal aunt, uncle, and grandparents of A.T. and R.T., the trial court reached the following conclusion:

In addition to the unknown perpetrator [of the repeated rectal abuse], we have the known commission of sexual

acts by and between [the cousins, R.T., and A.T.]. Although [A.T.] has indicated that the only sexual acts occurred by and between these four, Dr. Carrasco's conclusion was that these three boys could not have inflicted [A.T.'s] rectal injury. Thus, we have competent evidence that sexual activity took place within the [aunt and uncle's] or [the grandparents'] households, and that the rectal injury, caused by an unknown perpetrator, could have occurred in those households.

Trial Court Opinion at 12. The court also feared that the aunt and uncle would not provide the special services needed by the children, as they had waited seven weeks after learning of the possible sexual abuse of A.T. before having her examined and they did not believe that their sons had engaged in any sexual activity with A.T. These factors led the trial court to conclude that the protection of the children's well-being required that they remain in the custody of CYS.

In this appeal, the allegations of sexual abuse are addressed by the majority as follows:

The trial court gave great weight to A.T.'s testimony that sexual activity occurred between her and her boy cousins. However, even as related by the trial court, A.T.'s disclosures concerning her abuse have changed many times. Initially, A.T. implicated her brother R.T. and her cousins. Later, she excluded her brother. And then, even later, she disclosed that the sexual behavior occurred a long time ago in her parent's trailer before her mother's death. In fact, A.T. explained the source of the redness surrounding her vagina as "daddy's belt buckle." Moreover, when A.T.'s cousins were evaluated at Children's Hospital following A.T.'s examination, they were found to be well-adjusted boys who spoke openly and freely and were assessed as not likely to have committed the abuse perpetrated on A.T. Additionally, medical testimony established that the ages of the two cousins would indicate that they were unable anatomically to have perpetrated the certain acts which constituted the abuse. Finally, at

oral argument before this court, CYS stated its belief that A.T. suffered the sexual abuse at the hands of her natural father, R.T., Sr.

Majority Opinion at 11–12.

In my view, there are two problems with this analysis. First, it is essential that we distinguish between the types of abuse to which A.T. has been subjected. Although A.T.'s father has apparently been identified as the perpetrator of the severe rectal abuse,[2] it is less certain that he was responsible for the vaginal condition seen by Dr. Carrasco when she examined A.T. almost two months after the child had been taken away from her father.

Second, I do not consider A.T.'s disclosures concerning sexual activity with her cousins and/or brother to be so internally inconsistent as to warrant being summarily dismissed. In her conversations with Dr. Carrasco and Ms. Mari, A.T. said that her brother was present during the sexual activity between herself and her cousins. Although she told Dr. Carrasco but not Ms. Mari that her brother had participated in the activity, I question whether the significance of this particular fact would loom as large in the thinking of a six-year-old child as it does in the thinking of the adults who are reviewing her statements. With regard to the inconsistency of time and location, I consider Ms. Mari's explanation to be entirely reasonable: after A.T. was removed from the home of her aunt and uncle and placed in foster care, she related that the sexual activity had occurred in a more distant time and place because she feared being unable to return to her relatives' home if she admitted that the activity had taken place there. In addition, as noted earlier, Dr. Carrasco found A.T.'s disclosures concerning the vaginal touching to be "very credible," and it was

---

2. In their brief on appeal, appellants state that "Angela has subsequently admitted that her father was the adult perpetrator" (Brief for Appellants at vi f). We cannot rely on this statement, of course, as it appears only in the appellate brief and not in the original record. *Commonwealth v. Young,* 456 Pa. 102, 115, 317 A.2d 258, 264 (1974).

Ms. Mari's opinion that "some type of sexual activities have occurred between the four [children]."

The reservations just expressed do not lead me to the conclusion that the trial court's order should be affirmed. It is important to note that A.T., her brother, and her cousins did not testify. Therefore, the trial court did not have the opportunity to evaluate the credibility of A.T. herself, but instead could only evaluate, secondhand, what A.T. had said to the witnesses who testified at the hearing. In light of this fact, along with the uncertainties inherent in A.T.'s disclosures as related by Dr. Carrasco and Ms. Mari, I join the majority in disagreeing "with the trial court's finding that clear and convincing evidence exists that A.T.'s abuse occurred while in appellants' custody, thus leading to a finding of dependency" (Majority Opinion at 11). In my view, however, it would not serve the welfare of A.T. and R.T., who will surely need extensive help in coping with the traumatic events of their recent past, for this Court to conclude that A.T.'s disclosures concerning sexual activity with her brother and cousins are totally unworthy of belief.

I concur in the result reached by the majority insofar as they conclude that the trial court's adjudication of dependency in regard to A.T. and R.T. must be reversed and the case remanded for a custody proceeding. However, absent any indication that CYS will not discharge the responsibilities entrusted to it, I do not consider it necessary for this Court to advise CYS to update its investigation into the identity of A.T.'s abuser.