J. A04015/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF:  S.W., A MINOR   : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| APPEAL OF:  N.M., MOTHER            : | |
| : | No. 864 WDA 2015 |

Appeal from the Order Entered April 15, 2015,
in the Court of Common Pleas of Warren County
Civil Division at No. CP-62-DP-007

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., AND SHOGAN, J.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:                **FILED MAY 24, 2016**

N.M. ("Mother") appeals from the order entered April 15, 2015, in the

Court of Common Pleas of Warren County, Civil Division, subsequent to the

petition of Warren County Children and Youth Services ("Warren County

CYS," or "CYS"), adjudicating S.W. ("Child"), born in March of 2000,

dependent pursuant to 42 Pa.C.S.A. § 6302, and removing Child from

Mother's home.  After review, we affirm.

The factual history was summarized, in part, by the trial court as

follows:

> [S.W.] is a 15-year-old child who has resided in her
> mother's home her entire lifetime except for periods
> of hospitalization.  Her father was identified by the
> mother as [K.M.], a resident of North Carolina whom
> the mother believes died shortly after [S.W.]'s birth.
> The mother has moved repeatedly during [S.W.]'s
> lifetime having resided in North Carolina as well as
> other parts of Pennsylvania before residing in Warren
> County.   [S.W.] suffers from a  genetic, lifetime
> disorder that has resulted in global developmental

delays, intellectual impairment, limited language development, limited motor skills, extremely short stature and low body weight and microcephaly. The condition was generally diagnosed as lactic acidosis and has resulted in a number of emergency hospitalizations. Most recently, [S.W.] was diagnosed with Pyruvate dehydrogenase deficiency [PDD] or pyruvate dehydrogenase complex deficiency (PDCD), a neurodegenerative disorder associated with abnormal metabolism. [S.W.] operates on the level of an 18-24 month old. She attends Beaty Middle School and has an IEP that places her in the life skills classroom, as well as a medical plan in the school setting that includes constant nursing supervision and two meals per day at school. . . . Because of her condition, [S.W.] can require emergency medical care with a short onset of symptoms including lethargy, paleness, loss of appetite, irritability and extreme pain. As she cannot verbalize the onset of symptoms, [S.W.] has had numerous emergency hospitalizations. During her most recent hospitalization at Children's Hospital in Pittsburgh, CYS intervened and obtained emergency custody of [S.W.] She was placed in foster care and, at the time of the hearing, was comfortable there. Medical appointments have been rescheduled by CYS.

Order of Adjudication-Child Dependent, 4/14/15.

While Mother acknowledged that she and Child had been previously known to child welfare agencies in other counties, such as Columbia and Northumberland, Mother and Child had been known to Warren County CYS, receiving assistance since May of 2014. (Notes of testimony, 4/14/15 at 117, 230-231, 237-238.) As a result of concerns regarding Mother's care of S.W., on April 9, 2015, Warren County CYS filed an application for emergency custody. The application alleged various facts in support of the

custody request, including numerous hospitalizations, a failure to administer medication properly, and a failure to provide adequate nutrition and hygiene. By *ex parte* order the same date, the trial court granted the exercise of emergency custody and scheduled a hearing for April 14, 2015. Also on the same date, April 9, 2015, CYS filed a petition for dependency.

On April 14, 2015, the trial court held an adjudicatory and dispositional hearing. Warren County CYS presented the testimony of former and current CYS caseworkers, Melissa Baxter and Katie McGraw, Child's pediatrician, Dr. David M. McConnell, Jr., school nurse, Tina Zigler, and Child's foster parent, W.S. Mother offered her own testimony, as well as that of Child's attending physician and genetics expert, Dr. Gerald Vockley. At the conclusion of the hearing, the trial court entered an order adjudicating Child dependent without proper parental care and control, awarding legal and medical custody to Warren County CYS, and finding that the agency had made reasonable efforts to prevent removal.

On May 14, 2015, Mother filed a Motion to Add Entries to the Docket Statement, Reconsideration and Supplemental Relief, asserting the emergency custody order did not appear on the prothonotary's docket statement, and the occurrence of multiple procedural violations, including the failure to conduct a shelter care hearing. By order dated May 15, 2015, the trial court denied Mother's motion. On the same day, Mother, through

appointed counsel, then filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

> I. Was the trial court's finding that CYS met their burden of proof of clear and convincing evidence that the minor was without adequate parental care and control unsupported by the record established at trial, and were the trial court's inferences and deductions from the record an abuse of discretion?
>
> II. Was the trial court's finding that Warren County Children and Youth Services took reasonable steps to avoid removal from the home unsupported by the record; did the agency meet the applicable burden of proof of clear necessity; and were the inferences and deductions in support of this finding an abuse of discretion?
>
> III. Did the trial court's failure to conduct a Shelter Care Hearing and attendant procedural irregularities [sic] violations [of] the mother's constitutional rights to substantive due process, procedural due process, and effective counsel?

Mother's brief at 7-8.

As set forth, our standard of review for dependency cases is as follows:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), quoting *In re D.P.*, 972 A.2d at 1225.

Further, to adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child:

> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.
>
> 42 Pa.C.S.A. § 6302. "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re C.R.S.,* 696 A.2d 840, 843 (Pa. Super. 1997) (citation omitted).
>
> In accordance with the overarching purpose of the Juvenile Act "[t]o preserve the unity of the family wherever possible," *see* 42 Pa.C.S.A. § 6301(b)(1), "a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available." *In re R.T.,* 405 Pa. Super. 156, 592 A.2d 55, 57 (Pa. Super. 1991) (citation omitted). This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In re C.R.S., supra* at 845 (citation omitted).

*In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013).

With respect to when a child should be removed from parental custody, we have explained:

> The law is clear that a child should be removed from her parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being. In addition, this court had held that clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with her family are unfeasible.
>
> **In re K.B.***,* 276 Pa.Super. 380, 419 A.2d 508, 515 (1980) (citations omitted). In addition, this Court has stated: "[I]t is not for this [C]ourt, but for the trial court as fact finder, to determine whether [a child's] removal from her family was clearly necessary." **In re S.S.***,* 438 Pa.Super. 62, 651 A.2d 174, 177 (Pa.Super. 1994).

**A.B.***,* 63 A.3d at 349-350.

With her first issue, Mother challenges the finding of dependency as supported by the record. In adjudicating Child dependent, the trial court stated as follows:

> All right. Thank you. All right, obviously this is an extremely difficult case with [S.W.]'s diagnosis of PDD. And, that medical condition alone could be the cause, certainly the cause of her failure, her brain to grow, her intellectual impairment, her failure to thrive. Her developmental delays. All of that, obviously, could be caused by the PDD.
>
> And, therefore, the agency had the burden coming into court showing by clear and convincing evidence that [S.W.]'s out [sic] not with appropriate care and control in the mother's home.

. . . . It's clear that the mother did not follow up with the CP specialist in a timely manner. I don't buy the comments that it was about some type of group to help each other out.

Other families that suffer from that. Clear, it's a medical appointment. [S.W.] has cerebral palsy and she needed to see that specialist in a timely manner.

The delay in the genetic testing that could very well have resulted in this diagnosis four or five years ago, and could have changed the track of [S.W.]'s medical treatment.

There is just no, I saw a recommendation in 2009 for that. I don't understand why that wasn't complied with.

And, I should note that it's very easy to sit back and say what a parent should be doing when they have a child with this type of medical condition. And the lifetime commitment a parent has to make to that child.

But, these are specific findings that cause me concern. The noncompliance with the recent medication prescription. Clearly, strongly recommended or was indicated it's very important that [S.W.] receive that around lunch time in the school setting.

The school put the wheels in motion to do that. The mother went there three days to do that. And, then changed her mind on that. I don't buy the explanation as to why that was done.

That was a clear recommendation. It's on the bottle. It's in the contract from Children's Hospital. So, there is noncompliance with her medications. The mother's lack of presenc[e] at some or all of [S.W.]'s appointments or hospitalizations causes a concern.

The business about [S.W.] being ready in the morning from discharge, for discharge from Warren General; I don't know what other pressing business the mother had, but she certainly didn't reach out to the hospital from the morning until the evening when she showed up.

And, I believe the testimony, and the medical records support, that they couldn't communicate with her. Similarly, the mother going down to Children's on December 16th, last year, and deciding that [S.W.] would stay there, driving back home.

The agency came back with her a few days later to get her home. But, the testimony was also clear that large chunks of these hospitalizations in Pittsburgh, the mother wasn't at.

And, certainly, she understood that the agency would drive her there, because the caseworker did in December of 2014. She was provided either gas cards or other methods to get down there. And, she wasn't there.

I reviewed records from Geisinger where the mother wasn't available to provide medical history or wasn't at a consult or appointment to provide that history.

I understand some of it is based upon the mother's economic circumstances, and that can't be the sole basis for that finding of dependency, but certainly it's played a part in this.

Medical records I reviewed indicate that all or most providers have incomplete records because of the number of moves the motherly [sic] made with [S.W.]

That her own testimony about her transportation issues very precluded her from full involvement. Her current circumstances are that she

is $1700 behind on rent and in the middle of an eviction action.

Again, those are economic factors. But, they are playing a part in [S.W.]'s treatment. Her consistent, thorough medical treatment suffered because of the relocations, the lack of medical records.

The lack of follow up, whether it's because of financial issues or otherwise, it's interfered with [S.W.] receiving full handled, consistent treatment.

Two school districts, two school settings have avised [sic] the same complaint with weekend weight loss. The school in the Columbia area, via the medical record, indicated consistent weight loss over the weekend.

The mother testified [S.W.] was getting meals at school there, as well. Ms. Zigler's testimony about the same concern in Warren County for this school year, that's two school years and two schools that have the same concerns about this weight loss over the weekend.

The sporadic weight gains and weight losses that [S.W.] has had, the 14 and a half pound weight gain late 2009, early 2010. The eight and half or nine pound weight loss more recently. Those are concerning.

I don't understand why the school has to bathe [S.W.]. The mother is at home. She is not working. I don't know why two times a week school personnel has to interfere with the regular routine for [S.W.] by bathing her or showering her.

I believe the testimony of Ms. Zigler that [S.W.] comes to school dirty, sometimes with a bad odor. Sometimes with diapers that would indicate long-term failure to change.

> Those hygiene issues are concerns. All those provide a concern, particularly when you are dealing with somebody with the type of condition that [S.W.] has and the constant need for addressing any changes in her condition.
>
> For those reasons, I do find that the agency has met its burden of proof by clear and convincing evidence that [S.W.] is presently without appropriate parental care and control. She is adjudicated dependent.

Notes of testimony, 4/14/15 at 248-254.

However, in asserting a lack of clear and convincing evidence to establish medical neglect, Mother questions that it was proven that Child regularly experienced weight loss over the weekend. (Mother's brief at 15-16.) Mother contends that such a finding not only ran contrary to recent inquiry, but failed to consider Child's activity level over the weekend and the possibility of IV fluid retention while hospitalized. (*Id.* at 16-17). Moreover, Mother indicates that the reliance on Child's failure to gain weight in finding dependency disregarded the testimony of Dr. Gerald Vockley regarding the standard medical care for a patient with PDCD, the relation between Child's delay and her medical diagnosis, and significance of Child's failure to gain weight. (*Id.* at 18-21.) In addition, Mother highlights a lack of clear and convincing evidence as to her failure to address Child's diet. (*Id.* at 21.) Mother argues that she understood and was involved with regard to Child's diet. (*Id.* at 21-23.) Further, according to Mother, the court's other findings and underlying inferences and deductions related to failure to

provide adequate care and control were not supported by the record. (*Id.* at 23.) Mother references findings related to hygiene and medication. (*Id.* at 23-28.) Mother also alleges that the trial court committed an abuse of discretion by making findings of fact which were not alleged in the petition for dependency. (*Id.* at 28.) In the alternative, Mother suggests such findings were not supported by the record and did not meet the burden of proof. (*Id.*) Mother discusses findings related to truancy, communication, appointments and genetic testing, and eviction. (*Id.* at 28-33.)

Upon careful review of the record, we discern no abuse of discretion. We find that the competent evidence of record supports the trial court's order adjudicating Child dependent. For example, the evidence exposes a history of Mother's failure to follow medical advice and recommendations regarding appropriate testing and follow-up, affecting Child's diagnosis and treatment. Although genetic testing was first requested by those treating Child in 2009, testing resulting in diagnosis was not accomplished until March 2015, with Child's sample being supplied on December 9, 2014, while hospitalized.[1] (CYS Exhibit 1 at 40, 51, 87-88, 171; notes of testimony, 4/14/15 at 136-137, 213, 216-217; Mother's Exhibit 3; Mother's Exhibit 4.) Likewise, Mother failed to keep suggested medical appointments for Child, such as with the Cerebral Palsy Clinic at Children's Hospital of Pittsburgh, as

---

[1] Mother's sample, while not necessary, was not supplied until April 10, 2015. (Notes of testimony, 4/14/15 at 136-137.)

well as others. (Notes of testimony, 4/14/15 at 123-124; 132-134, 145, 224-225; CYS Exhibit 1 at 51, 78.) Additionally complicating and frustrating Child's diagnosis and treatment were Mother's frequent relocations with Child, which resulted in incomplete medical records and history, as well as Mother's history of lack of availability to medical providers during Child's hospitalizations, which again resulted in deficient medical records and history and the Child being held in the hospital beyond readiness for discharge. (CYS Exhibit 1 at 1, 3, 87, 96, 103, 106, 109, 114, 117, 118, 119, 128, 139, 144, 158, 162, 171, 172; notes of testimony, 4/14/15 at 17, 24, 55, 74, 126-127, 138-139, 142-145.) Child's pediatrician, Dr. David McConnell, Jr., testified on this point as follows:

> Q. Have there been any times when, since [S.W.] has been under your service, that she has been hospitalized and you had difficulty communicating with her, with mother?
>
> A. We have, at some times, tried to call her, and got, get responses, when we had her hospitalized at Warren General, and were discharging her in the morning, weren't able to reach the mother until the evening, for her to go home.

Notes of testimony, 4/14/15 at 55. In addition, Mother failed to appropriately follow medication protocol for Child, opting not to have the school give Child a dose of erythromycin before lunch, as prescribed. (CYS Exhibit 4; notes of testimony 4/14/15 at 22-23, 53, 60-62, 82-85, 98-99, 107-109, 183-184, 201, 225-226.)

Further, the medical records and testimony of CYS case worker, Melissa Baxter, and school nurse, Tina Zigler, reveal concerns by two separate schools regarding Child's weight. (CYS Exhibit 1 at 87, 143-44, 165, 170-171; notes of testimony, 4/14/15 at 77-78, 100-102, 117-118, 229-230.) Specifically, record from GMC-Geisinger Medical Center from November 1, 2013 states, "There has [sic] been significant concerns from school regarding her nutrition and they feel that she gains weight during the week but looses [sic] every weekend." (CYS Exhibit 1 at 165.) Moreover, record from November 15, 2013 indicates, in part, "It appears prolonged fasting and dehydration as a reason for [S.W.]'s metabolic decompensation. Apart from her possible working metabolic diagnosis, her repeated decompensation at home are concerning." (***Id.*** at 131.) Interestingly, Mother relocated shortly after these concerns were noted in November 2013. (Notes of testimony, 4/14/15 at 186-187.) Finally, testimony from Ms. Zigler confirms additional concerns related to Child's hygiene. (***Id.*** at 80-81, 96-98, 102-103, 110-111.) As such, the record substantiates the lack of parental care and control and finding of dependency and we will not disturb this finding.

Next, in Mother's second issue, she disputes the finding of reasonable efforts to avoid Child's removal from the home. In finding reasonable efforts were made to avoid Child's removal from Mother's home, the trial court stated:

> The agency has made all reasonable efforts to try to avoid this. I heard from two separate caseworkers that have been providing a number of services in the hopes to avoid placement.
>
> All of the in-school services that [S.W.] is receiving. The medical plan. The individualized education program for her. So, reasonable efforts have been made to prevent this placement from occurring.

*Id.* at 254.

Nonetheless, Mother argues that the record "showed failures of communication by service providers that hindered her ability to understand and comply with expectations." (Mother's brief at 37.) Mother references hygiene and weight and diet. (*Id.* at 38-42.) Mother likewise avers that Child's removal from the home was premature, as Child's diet was experimental and had been altered. Mother, therefore, proffers that she was not given the opportunity to employ the new diet prior to CYS obtaining custody. (*Id.* at 43-44). Further, the truancy plan had only been implemented one week prior to CYS' application for emergency custody. (*Id.* at 44.)

After review of the record, we again discern no abuse of discretion. We find that the competent evidence of record supports the trial court's order removing Child from Mother's home. CYS caseworker, Melissa Baxter, testified to assisting Mother with coordinating insurance coverage for diapers for Child and re-establishing insurance coverage for nutritional supplements for Child, the latter of which had ceased due to relocation, scheduling

medical appointments, facilitating and/or providing transportation, and conducting a family team meeting in order to create the family service plan. (Notes of testimony, 4/14/15 at 121-128, 138-139.) CYS caseworker, Katie McGraw, testified to aiding Mother with truancy concerns and transportation, as well as the agency attempting to assist with inspection of Mother's vehicle. (*Id.* at 170-171, 174-176.) Further, school nurse, Tina Zigler, testified to the school via a nurse assisting Child with daily needs such as with hygiene, meals, and ambulating through hallway. Although not part of Child's medical plan, the school bathed Child approximately twice per week. (*Id.* at 77-78, 80-81, 88-89, 102-104, 110-111.) However, these services were in jeopardy as Mother expressed her desire to homeschool Child and to yet again relocate, as she was dealing with eviction proceedings. (*Id.* at 147, 172-173; CYS Exhibit 3.) Hence, when viewed in context of Mother's intentions, the record corroborates the trial court's finding of reasonable efforts to prevent removal and we will not disturb this finding.

Lastly, Mother raises violations of her constitutional rights to substantive due process, procedural due process, and effective counsel as a result of the trial court's failure to conduct a shelter care hearing and attendant procedural irregularities. The trial court suggested that Mother waived these issues "by failing to raise those issues in a timely manner." (Trial court opinion, 5/22/15 at 1.) The court stated:

> At no point prior to the filing of a Motion for Reconsideration approximately one (1) month after the hearing did Appellant raise these issues. Appellant appeared for a six (6) Hour hearing represented by counsel. At no time did Appellant assert the alleged procedural violations, ask for a continuance, or otherwise assert any objection whatsoever to the Court conducting an adjudicatory hearing. In fact, all counsel were present in chambers for a pre-hearing conference and Appellant's counsel requested he be permitted to call a medical expert out of order at the start of the proceeding. The hearing was clearly announced at the commencement of the hearing to be a "dependency" hearing.

*Id.*

Mother, however, argues that not only do the Rules of Juvenile Court Procedure allow a broad motions practice, but that the issue was raised and appealed within 30 days. (Mother's brief at 49.) Mother avers that no shelter care hearing or contested proceeding to allow for findings of fact pursuant to Pa.R.J.C.P. 1242(C) was contemplated, scheduled, or conducted, which resulted in multiple procedural irregularities. (*Id.* at 50-51.) Mother further indicates that the process as a whole severely compromised her ability to present her case. (*Id.* at 51.) Moreover, Mother posits that the procedural irregularities were so deficient, and the process so rapid, that a finding of waiver for failure to preserve by objection may not be equitable. (*Id.* at 53.)

We agree with the trial court and adopt its opinion as our own with regard to this issue. For the reasons set forth by the trial court, these issues are waived.

Accordingly, after a thorough review of the record, including the notes of testimony of the April 14, 2015 hearing, the extensive exhibits presented, the trial court opinion, as well as the parties' briefs, as we discern no abuse of discretion, we affirm the order of the trial court adjudicating Child dependent, and removing Child from Mother's home.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/24/2016

IN THE COURT OF COMMON PLEAS
OF THE 37th JUDICIAL DISTRICT OF PENNSYLVANIA
WARREN COUNTY BRANCH
JUVENILE DIVISION

IN THE INTEREST OF:

SABRINA WRIGHT

CP-62-DP-0000007-2014

62-FN-000004-2015

### MEMORANDUM OPINION PURSUANT TO PA.R.A.P. 1925(A)

Appellant's, the mother, Statement of Matters Complained of on Appeal raises four

issues. The first two Matters Complained of on Appeal allege due process violations. The

remaining two Matters Complained of on Appeal challenge the sufficiency of evidence.

With respect to Matters Complained of on Appeal I and II, clearly the Appellant waived

those issues by failing to raise those issues in a timely manner. Appellant argues that the Court

conducted an adjudicatory hearing in violation of Pa.R.J.C.P. 1363 and the scheduling order did

not give Appellant adequate notice of the type of hearing to be conducted. At no point prior to

the filing of a Motion for Reconsideration approximately one (1) month after the hearing did

Appellant raise these issues. Appellant appeared for a six (6) Hour hearing represented by

counsel. At no time did the Appellant assert the alleged procedural violations, ask for a

continuance, or otherwise assert any objection whatsoever to the Court conducting an

adjudicatory hearing. In fact, all counsel were present in chambers for a pre-hearing conference

and Appellant's counsel requested that he be permitted to call a medical expert out of order at the

start of the proceeding. The hearing was clearly announced at the commencement of the hearing

to be a "dependency" hearing. The Pennsylvania Superior Court has held:

> In order to preserve an issue for appellate review, a party must make a timely and
> specific objection at the appropriate stage of the proceedings before the trial court.
> Failure to timely object to a basic and fundamental error will result in waiver of
> the issue. On appeal the Superior Court will not consider a claim which was not
> called to the trial court's attention at a time when any error committed would have

1

been corrected. In this jurisdiction ... one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

In re S.C.B., 990 A.2d 762, 767 (Pa. Super. Ct. 2010). This rule has been applied specifically to dependency proceedings. In re J.A., 107 A.3d 799, 820 (Pa. Super. Ct. 2015). Therefore, Appellant has waived these issues for purposes of appeal.

With respect to the errors asserted in III and IV, the Court addressed these issues in its opinion on the record following the hearing and in its Order of Adjudication entered in this matter. No further opinion shall follow.

BY THE COURT,

GREGORY J. HAMMOND, J.
May 21, 2015

FILED
2015 MAY 22 AM 9: 56
WARREN COUNTY
PROTHONOTARY/
CLERK OF COURTS

2