J-S12015-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: F.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| APPEAL OF: F.W., FATHER | |
| Appellant | No. 2259 EDA 2014 |

Appeal from the Order Entered June 30, 2014
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0001439-2014
CP-51-FN-465690-2009

BEFORE:  BOWES, SHOGAN and FITZGERALD,* JJ.

MEMORANDUM BY BOWES, J:                    **FILED APRIL 14, 2015**

F.W. ("Father") appeals from the June 30, 2014 order of adjudication and disposition wherein the juvenile court adjudicated his son, F.W.,[1] dependent and placed the child in foster care.  After a thorough review of the certified record and applicable law, we affirm.

F.W. was born during September 2012.  Prior to spring 2014, F.W. resided with his birth mother, J.S. ("Mother"), and his two half-brothers. The Philadelphia County Department of Human Services ("DHS") has had extensive interaction with Mother and her children.  Between April 2010 and November 2011, the agency issued three substantiated general protective

---

[1] Since father and son share identical initials, hereinafter, our references to F.W. relate to the child.

*  Former Justice specially assigned to the Superior Court.

services ("GPS") reports involving F.W.'s half-siblings. However, none of the previous GPS reports resulted in any adjudications of dependency.

During April of 2014, Father obtained custody of F.W. without DHS's knowledge. Shortly thereafter, DHS reinitiated its involvement with the family after Mother was arrested for recklessly endangering a child and for recklessly endangering another person. Thereafter, the agency issued another GPS report, and on June 19, 2014, the trial court adjudicated F.W.'s two half-siblings dependent. The juvenile court continued the dependency case relating to F.W. and directed DHS to obtain an order of protective custody ("OPC"). Soon after interceding in this matter, DHS learned that F.W. was in Father's care. Indeed, Yolanda Shields, the DHS caseworker assigned to the family, testified that she observed Father and F.W. together in the 2100 block of North Percy Street in Philadelphia. She explained that DHS declined to seek an OPC for F.W. at that juncture since Father's involvement in his son's care was not alarming and the DHS investigation of Father's living arrangement was pending.

On June 23, 2014, Father contacted DHS and confirmed that he had custody of F.W. since April 2014. Father provided DHS two Philadelphia addresses: (1) 2131 North Percy Street; and (2) 1518 Myrtlewood Street, a residence that is owned by his sister, C.W. ("Paternal Aunt"). While the parties dispute how often Father stayed at the Myrtlewood Street residence during the relevant period, it is undisputed that F.W. lived in that home

since April 2014. DHS examined Paternal Aunt's home and reviewed her extensive criminal history. The agency determined that the physical condition of the residence was acceptable. It had utilities, home safety devices, food, and a toddler bed for F.W. Additionally, DHS found that, although Paternal Aunt had an extensive criminal record, she did not commit any offenses that would preclude her from being considered as a placement option. However, since the agency was unable either to endorse Father at that point or to document his full-time habitation at Paternal Aunt's home, it placed F.W. into foster care.

During the ensuing adjudicatory hearing, DHS presented testimony from Ms. Shields and called Father to testify as if on cross-examination. Father also testified on his own behalf. As it relates to the issues on appeal, DHS presented evidence that Father, *inter alia*, made questionable parenting decisions regarding F.W.'s welfare, lacked stable employment, failed to reside with F.W. during the entire week, and had relatively recent convictions for possession of marijuana and harassment. Significantly, the 2013 harassment conviction stemmed from an incident involving Mother. Additionally, Father was convicted of indecent assault during 1992. Depending upon the age of that victim, the juvenile court could have found aggravated circumstances in this case pursuant to 42 Pa.C.S. § 6302(3)(ii). However, since no evidence was presented to indicate the age of the victim, the juvenile court did not make any findings regarding aggravated

circumstances. *See* N.T., 6/30/14, at 60 ("The court will take judicial notice [of the offenses] for whatever it's worth"). At the close of the hearing, the juvenile court adjudicated F.W. dependent as the term is defined in the Juvenile Act, 42 Pa.C.S.§ 6302(1), relating to children who lack proper care and control.

The goal of the initial permanent placement plan was "return to parent or guardian." Order of Adjudication and Disposition, 3/30/14, at 1. However, since questions existed concerning whether Father lived with Paternal Aunt seven days per week, the juvenile court continued F.W.'s placement in foster care and directed DHS to continue to investigate potential kinship placement resources. The court granted Father supervised visitation with his son twice per week and referred Father to the Clinical Evaluation Unit for an immediate drug screen, a dual diagnosis assessment, and monitoring. Additionally, the juvenile court directed DHS to refer Father to a domestic violence program, parenting services, and housing assistance.

Father filed a timely notice of appeal and complied with Pa.R.A.P. 1925(a)(2)(i) by concomitantly filing a concise statement of errors complained of on appeal. Father presents one issue for review.

> Did the Court err in adjudicating the child dependent and removing the child from the Father's care where the Department of Human Services failed to prove by clear and convincing evidence that the child was a dependent child under 42 Pa.C.S.A §6302, and failed to prove by clear and convincing evidence that the Department made reasonable efforts to prevent the need for placement of the child?

Father's brief at 3.[2]

The following principles are pertinent. In *In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013) (quoting *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)), we explained,

> Our Supreme Court set forth our standard of review for dependency cases as follows.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

In order to adjudicate F.W. dependent, DHS was required to prove by clear and convincing evidence that F.W. "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S. § 6302. We have defined clear and convincing evidence as "testimony that is 'so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *In re A.B.*, *supra* at 349 (*quoting In re C.R.S.*, 696 A.2d 840, 843 (Pa.Super. 1997)).

_____

[2] The DHS brief was due on January 5, 2015. As of the date of this writing, the agency failed to file a responsive brief.

The first aspect of Father's argument challenges the juvenile court's finding that F.W. was a dependent child. Father asserts that, under the totality of the circumstances, the adjudication of dependency was not warranted. As the certified record supports the court's determination, we disagree.

In sum, the juvenile court took a prospective view of the events and circumstances that arose during F.W.'s brief time in Father's custody and deduced that Father is unable to provide F.W. with the proper parental care necessary to maintain the child's physical, mental, and emotional health. The juvenile court stressed that Father's living arrangement is uncertain and his employment is unstable. Additionally, the court highlighted that Father declined all responsibility for F.W.'s medical care prior to April 2014, and in the short time that Father had custody of his then-two-year-old-son, he failed to update his medical and dental care, ensure that his immunizations were current, or utilize the child's medical assistance benefits.

Father testified that he attempted to take F.W. to the doctor but was rebuffed because he lacked insurance. While Father's brief states that he was in the process of switching F.W.'s coverage when DHS interceded, the record belies this contention. Indeed, as the trial court points out, rather than addressing the administrative impediment to F.W.'s medical coverage, *i.e.*, the fact that the child was listed under Mother's medical assistance, Father simply declined to return the child to his doctor or utilize a free health

clinic. Father's testimony during the hearing was replete with purported clarifications, explanations, and justifications regarding his criminal record, employment status, living arrangement, and parental care. However, the juvenile court repeatedly made credibility determinations against Father and in favor of DHS's witness, Ms. Shields.

The court explained,

Father assumed Child's care on April 2014, when mother was arrested (N.T. 6/30/14, pgs. 39, 41, 43, 51). Child remained with Father until June 23rd, whereby Child was removed by order of court. Throughout the period of time Child was with Father, he did not follow up to ensure the Child had a medical exam and obtained his immunizations (N.T. 6/30/14, pgs. 39, 48-49, 52). Despite the fact that Father was the primary caregiver for the Child, Father expressly evaded his parental obligation stating that Child's health was mother's responsibility (N.T. 6/30/14, pgs. 48-49, 52). The record also reflects certain concerns with Father's housing. Father testified that he currently lives with his sister seven days a week at 1518 Myrtlewood Street, Philadelphia, PA (N.T. 6/30/14, pgs. 35-36, 49-52). However, his sister stated to DHS that Father lives with her only three days a week, contradicting Father's testimony (N.T. 6/30/14, pgs. 38, 40). His residence the other four days is unknown (N.T. 6/30/14, pg. 38). Reaching the Child to provide services would be difficult as well as unsafe without knowing Father's whereabouts (N.T. 6/30/14, pg. 38). In adjudicating Child dependent, the trial court also considered Father's economic instability. Father testified that he works odds jobs, such as painting and construction (N.T. 6/30/14, pg. 36). Initially, Father specified he worked forty hours during the last thirty days; however, in further testimony, Father stated that in a period of thirty days he only worked thirty hours (N.T. 6/30/14, pgs. 56-58). Father's ability to properly support his Child is highly concerning since now he has become the potential primary caregiver for the Child. Up until mother's incarceration in April 2014, mother was the primary caregiver.

        Additionally, the court considered Father's criminal history.
    He was found guilty of possession of marijuana in 2011 (N.T.
    6/30/14, pgs. 48, 53-54). Father alluded that he was holding the
    marijuana for a friend, but has admitted usage in the past (N.T.
    6/30/14, pgs. 53-55). In November 2013, Father was convicted
    for harassing mother (N.T. 6/30/14, pgs. 47-48). Furthermore,
    Father has an indecent assault conviction from 1992 (N.T.
    6/30/14, pgs. 32-35). Additionally, if you take Father's
    testimony as being truthful as to where he lives, Father has
    made a judgment to live with a paternal aunt with a long
    criminal history (N.T. 6/30/14, pg. 36). Exposing the Child to an
    environment where adults have extensive criminal records is not
    proper care geared to the particularized needs of the Child[.]

        Taking all the testimony of this case into consideration,
    including the short period of time Father was the primary
    caretaker for the Child, the trial court decided there is clear and
    convincing evidence that Father is unable to provide proper
    parental care for the physical, mental and emotional health of
    his two-year old Child without risking his health, safety and
    welfare. DHS witness was found to be credible. Father was found
    not to be credible. The trial court ascertained not only what sort
    of parental care the Child received in the past, but also what sort
    of parental care the Child will receive if custody is given to the
    Father. **In [*I*]interest of K.B.**, 276 Pa.Super, 380,419 A.2d 508
    (1980).

Trial Court Opinion, 10/21/14, at 3-4.

    Father's substantive argument assails the juvenile court for failing to

consider evidence and testimony that was advantageous to his position. For

instance, Father points to his testimony that he, in fact, lived with Paternal

Aunt fulltime since he took custody of F.W. during April of 2014, his

justification for failing to confirm that F.W.'s immunizations were up to date,

and his testimony that he does not use marijuana despite his guilty plea to

possession of marijuana during 2011. As it relates to that offense, Father

stated that he was holding the drug for a "friend" and had not smoked marijuana in five to ten years.  N.T., 6/30/14, at 53-54.  Although Father noted his willingness to submit a urine sample immediately after the adjudicatory hearing, he hedged, "I do not know if I will be able to [urinate.]" *See* N.T, 6/30/14, at 63.  The certified record does not indicate whether Father was able to produce a urine sample or reveal the results of any ensuing drug screens.

The cruces of Father's arguments essentially request that we ignore our standard of review, reweigh the evidence, and make a determination in his favor.  We must decline.  *See In Re A.B*, *supra* at 349 ("The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record").  Moreover, the certified record sustains the trial court's determination.

During the adjudicatory hearing, Ms. Shields testified that DHS was primarily concerned with Father's unusual living arrangement and highlighted the agency's unease about returning F.W. to Father under the current circumstances.  N.T, 6/30/14, at 38.  As noted, Father provided DHS two different Philadelphia addresses.  *Id*. at 31.  Approximately one week prior to the hearing, Paternal Aunt informed Ms. Shields that Father resided at her home on Myrtlewood Street only three days per week and that she did not know where Father lived the remainder of the week.  *Id*. at 38, 40.  That

information conflicted with Father's April 2014 statement to Ms. Shields that he had moved from the Perry Street residence. *Id*. at 44. Furthermore, as of the date of the hearing, Father still had not documented his actual living arrangement. *Id*. at 38. Thus, Ms. Shields's concerns persisited.

In addition, Ms. Shields observed that F.W.'s immunizations were not current and that he had not been examined by a doctor in one year. *Id*. at 39, 40-41. Moreover, Ms. Shields outlined Father's and Paternal Aunt's criminal records. Specifically, she testified, "I performed a clearance on the paternal aunt. She had no prohibited offenses. But she did have a long criminal history. But it was not considered a prohibited offense." *Id*. at 32. As it relates to Father, Ms. Shields stated, "Father had a prohibited offense.[3] A conviction. There were several of them actually." *Id*. Hence, the record supports the court's assessment of the respective criminal records.

Father also asserts that his financial uncertainty was not a proper ground to adjudicate F.W. dependent. We agree with this component of Father's argument. Presuming that a child receives basic subsistence, a parent's economic status alone is an improper basis for an adjudication of dependency. *See In re R.R.*, 686 A.2d 1316, 1318 n.1 (Pa.Super. 1996). Instantly, the trial court referred to Father's "economic instability" as "highly

---

[3] As noted in the body of this writing, the juvenile court did not treat Father's 1992 indecent assault conviction as a prohibited offense.

concerning" in light of the fact that Father had never previously acted as F.W.'s primary caregiver. *See* Trial Court Opinion, 10/21/14, at 4. Thus, absent some evidence that F.W. lacked basic subsistence, the juvenile court erred in relying upon financial considerations as a reason to adjudicate F.W. dependent.[4] Accordingly, we reject that aspect of the court's rationale as contrary to law. Instantly, however, in addition to referencing Father's economic status, the juvenile court also invoked Father's poor decision making, uncertain living arrangement, and his and Paternal Aunt's criminal histories. As the certified record sustains the remaining, valid grounds for the adjudication, we will not disturb the order adjudicating F.W. dependent.

On appeal, Father challenges as hearsay Ms. Shields's testimony regarding Paternal Aunt's statement that Father lived with her only three days a week. However, since Father failed to level a hearsay objection when the evidence was proffered, the issue regarding the supposed hearsay testimony is waived. Moreover, to the extent that Father challenged the reliability of Ms. Shields's iteration during his summation of evidence, the trial court made an express credibility determination in the witness's favor. Given that the record sustains the court's credibility determination, no relief is due.

---

[4] While Father's bleak financial outlook is an improper ground to adjudicate F.W. dependent, Father's sporadic employment remains a relevant and accurate reflection of his general instability. Thus, to the extent that the court considered Father's employment history for this purpose, the reference is benign.

In the second component of his argument, Father argues that DHS failed to make reasonable efforts to prevent F.W.'s placement. Additionally, Father disagrees with the juvenile court's conclusion that his and Paternal Aunt's convictions affected his ability to parent F.W. because the convictions did not preclude their involvement *per se*. Again, his arguments are unpersuasive. Our review of this issue is guided by the following principles:

> In regard to when a child should be removed from parental custody, we have stated:
>
>> The law is clear that a child should be removed from her parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being. In addition, this court had held that clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with her family are unfeasible.
>
> *In re K.B.,* 276 Pa.Super. 380, 419 A.2d 508, 515 (1980) (citations omitted). In addition, this Court has stated: "[I]t is not for this [C]ourt, but for the trial court as fact finder, to determine whether [a child's] removal from her family was clearly necessary." *In re S.S.,* 438 Pa.Super. 62, 651 A.2d 174, 177 (1994).

*In re A.B.*, *supra* at 349-350.

Father's argument necessarily overlooks Ms. Shields's testimony regarding the steps the agency took to determine whether it would be feasible for F.W to reside with Father at Paternal Aunt's home. As the trial court outlined in its Rule 1925(a) opinion, Ms. Shields testified that DHS investigated the feasibility of Paternal Aunt, who was the only relative that

Father presented, and performed an assessment of her home. N.T., 6/30/14, at 31-32, 37, 45. The agency found that Paternal Aunt's home was appropriate for F.W. but determined that it could not return F.W. to Father because the aunt had informed the agency that Father did not stay at the residence fulltime. *Id*. at 38, 40. Moreover, the location, and consequently the feasibility, of Father's alternate accommodations were unknown as of the date of the dependency proceedings. *Id*. at 38. Thus, the trial court concluded,

> Based on the information provided by Father, DHS made reasonable efforts to prevent Child's placement, and when the Child was placed[,] it was in the less restrictive environment available. The trial court notes that although Father only indicated paternal aunt as a possible resource to DHS, Father was well aware that there were other relatives in Philadelphia that he chose not to disclose to DHS based on his testimony at the adjudicatory hearing (N.T. 6/30/14, pgs. 64-65).

Trial Court Opinion, 10/21/14, at 6.

Father's arguments simply rehash his challenges to the weight of the evidence supporting the juvenile court's determination regarding the uncertainty of Father's living arrangements and the effect of his and Paternal Aunt's criminal records. However, for the reasons we expressed *supra*, we are not vested with the authority to reweigh the evidence in order to make a determination in Father's favor. **See In Re A.B**, **supra** at 350 ("It is not for this Court, but for the trial court as fact finder, to determine whether a child's removal from her family was clearly necessary.").

- 13 -

All told, the facts regarding Father's care of F.W. present a close case. While we find that the certified record sustains the juvenile court's factual conclusions and credibility determinations, it is not self-evident that a different fact finder considering the identical factual scenario would reach the same conclusions as the juvenile court herein. However, our responsibility is not to review the facts anew. The juvenile court was in a superior position to assess the witnesses' credibility and evaluate the conflicting evidence.

Ultimately, the court determined that Father did not dwell at Paternal Aunt's home more than three days per week and that his and Paternal Aunt's criminal records were sufficiently distressing to raise a safety concern even though neither record warranted automatic disqualification. That situation, in combination with the safety concerns stemming from Father's commitment to F.W.'s welfare and his potential drug use made F.W.'s placement in foster care necessary to enforce the child's wellbeing.

Finally, we observe that neither the technical effects of the juvenile court's adjudication of dependency and placement of F.W. in foster care nor their practical ramifications are tantamount to terminating Father's parental rights. Unlike an involuntary termination of parental rights, orders entered under the Juvenile Act are subject to periodic review and modification. *See In Interest of R.T.*, 592 A.2d 55, 61 (Pa.Super. 1991) (quotation omitted) ("[I]n the interest of safeguarding the permanent welfare of the child, decrees concerning children are temporary and subject to modification to

meet changing conditions."). Here, the juvenile court ordered DHS to provide Father biweekly visitation with F.W. and to refer him to services and programs that are designed to address his parenting deficiencies and lead to reunification. The court's temporary measures permit DHS to maintain oversight of Father's parenting and to ensure F.W.'s best interest until Father is able to document where he lives, address his parenting deficiencies, and demonstrate that his and Paternal Aunt's criminal histories will not place his son in danger. After Father resolves these issues, the juvenile court can place F.W. with Father and/or Paternal Aunt with confidence, and DHS can continue to provide the family services until the court determines that F.W. is no longer a dependent child.

For all of the foregoing reasons, we affirm the juvenile court's adjudication and disposition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/14/2015