J-A10017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: K.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.D., MOTHER | No. 1912 MDA 2014 |

Appeal from the Order Entered October 17, 2014
In the Court of Common Pleas of Berks County
Juvenile Division at No(s): CP-06-DP-329-2014

| | |
|---|---|
| IN THE INTEREST OF: D.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF S.D., NATURAL MOTHER | No. 1913 MDA 2014 |

Appeal from the Order Entered October 17, 2014
In the Court of Common Pleas of Berks County
Juvenile Division at No(s): CP-06-DP-0000328-2014

| | |
|---|---|
| IN THE INTEREST OF: R.A-H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF S.D., MOTHER | No. 1914 MDA 2014 |

Appeal from the Order Entered October 17, 2014
In the Court of Common Pleas of Berks County
Juvenile Division at No(s): CP-06-DP-327-2014

| IN THE INTEREST OF: I.A-H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.D., MOTHER | No. 1915 MDA 2014 |

Appeal from the Order Entered October 17, 2014
In the Court of Common Pleas of Berks County
Juvenile Division at No(s): CP-06-DP-326-2014

| IN THE INTEREST OF: S.K., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.D., NATURAL MOTHER | No. 1916 MDA 2014 |

Appeal from the Order Entered October 17, 2014
In the Court of Common Pleas of Berks County
Juvenile Division at No(s): CP-06-DP-0000325-2014

BEFORE:  GANTMAN, P.J., MUNDY, J., and JENKINS, J.

MEMORANDUM BY MUNDY, J.:                          **FILED JUNE 23, 2015**

Appellant, S.D. (Mother), appeals from the October 17, 2014 orders adjudicating as dependent her five minor children, K.D., a male, born in September 2011; D.D., a male, born in November 2009; R.A.-H., a male, born in September 2006; I.A.-H., a female, born in February 2004; and

- 2 -

S.K., a female, born in October 1999 (collectively, the Children).[1]   After careful review, we affirm.

This appeal arises from dependency petitions filed by the Berks County Children and Youth Services (BCCYS) on August 20, 2014, alleging that the Children were without the proper care and control necessary for their physical, mental or emotional health.  At that time, the Children resided with Mother and A.D., her husband,[2] in the home of the Children's maternal grandparents.  A.D. is the biological father of Mother's two youngest children, D.D. and K.D.

The trial court held an adjudicatory hearing on October 15, 2014, during which BCCYS presented testimony of its caseworker, Susan Bamford, and Joseph Snell, a criminal investigator for the City of Reading Police Department.  In addition, BCCYS presented Mother as a witness, and she was cross-examined by her counsel, counsel for A.D., counsel for the other

---

[1] We note that during the pendency of this appeal Mother has filed a subsequent notice of appeal from an order entered on March 18, 2015 involving R.A.-H. and I.A.-H.  These appeals have been consolidated and are docketed at 608 MDA 2015 and 607 MDA 2015.  As the outcome of those appeals has no impact on the instant appeal they will be addressed by a separate panel.

[2] The record does not reveal when Mother married A.D.  However, Mother testified at the subject proceedings that she has been involved with A.D. for approximately four and one-half years.  N.T., 10/15/14, at 6.

biological fathers of the Children,[3] and the Guardian *Ad Litem* (GAL). Mother presented the testimony of D.K., the Children's maternal grandmother. A.D. was present for the hearing, but he did not testify or present any evidence.

The testimonial and documentary evidence revealed as follows. On July 24, 2014, a criminal complaint was filed against A.D. alleging the crimes of contact/communication with a minor involving sexual abuse, child pornography, and corruption of minors. N.T., 10/15/14, at Exhibit 8. The incidents leading to the criminal charges involved, in part, A.D. inappropriately communicating via Facebook with his stepdaughter, I.A.-H., then age ten, during which he sent a picture of an erect penis to her, and attempted to solicit her by offering her $50.00 in return for her sending him naked photos of herself.[4] N.T., 10/15/14, at 55-56. As a result of a search warrant, A.D.'s telephone was seized, on which Detective Snell testified was found "a lot of pornography," an undisclosed amount of which included child pornography. *Id.* at 56.

The evidence further reveals that A.D. has a sexual offense history as a juvenile. In 1995, when he was approximately twelve years old, A.D.

_____

[3] R.H., the father of I.A.-H. and R.A.H., appeared at the hearing and was represented by counsel. In addition, E.L., the father of one of the children, which we presume is S.K., did not appear at the hearing, but was also represented by counsel.

[4] The record includes an affidavit of probable cause wherein it is alleged that A.D. asked I.A.-H. via Facebook to send him naked pictures of her breasts and vagina. N.T., 12/12/14, at Exhibit 9.

began outpatient juvenile sexual offender treatment due to his conviction for sexually assaulting his sister and allegations that he had sexually assaulted two neighbor children. N.T., 10/15/14, at Exhibit 1. In 1996, Reading Specialists recommended that A.D. be placed in a residential treatment facility. *Id.* A.D. was placed at South Mountain/Cornell Abraxas, and was released in 2003, when he was twenty years old. *Id.*

On October 17, 2014, the trial court adjudicated the Children dependent. The court explained its rationale as follows.

> The [C]hildren's physical custody remained with Mother and the [trial c]ourt ordered that Mother and A.D. participate in enumerated services. Specifically, the [trial c]ourt ordered that Mother cooperate with a non-offending parent evaluation and any recommended treatment and that A.D. cooperate with a sexual offender evaluation and recommended treatment. A.D. was also ordered to not have any contact with the minor children until therapeutic recommendation.

Trial Court Opinion, 12/12/14, at 1-2.

On November 13, 2014, Mother filed notices of appeal. On November 14, 2014, Mother filed concise statements of errors complained of on appeal.[5] This Court consolidated Mother's appeals *sua sponte* on December

---

[5] Although Mother did not file the concise statement simultaneously with the notice of appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i), we conclude that her procedural misstep was harmless, as it was not prejudicial to any of the parties and did not impede the trial court's ability to issue a thorough opinion. *See In re K.T.E.L*, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that the failure to file a concise statement of

*(Footnote Continued Next Page)*

3, 2014.[6]  On December 12, 2014, the trial court issued an opinion pursuant to Rule 1925(a).

On appeal, Mother raises the following questions for our review.

> 1. Did the trial court err in finding the children dependent?
>
> 2. Did the trial court err in failing to dismiss this action because the petition was not promptly served as required?

Mother's Brief at 4.

Our Supreme Court set forth our standard of review for dependency cases as follows.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law.  Accordingly, we review for an abuse of discretion.

***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

> To adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child:
>
> > is without proper parental care or control, subsistence, education as required by law, or

_(Footnote Continued)_ _____

errors complained of on appeal **with** the notice of appeal will result in a defective notice of appeal, to be disposed of on a case-by-case basis) (emphasis in original).

[6] Neither A.D. nor any of the Children's biological fathers filed notices of appeal, and none are a party to this appeal.

- 6 -

other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.

42 Pa.C.S.A. § 6302. "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re C.R.S.,* 696 A.2d 840, 843 (Pa. Super. 1997) (citation omitted).

In accordance with the overarching purpose of the Juvenile Act "[t]o preserve the unity of the family wherever possible," *see* 42 Pa.C.S.A. § 6301(b)(1), "a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available." *In re R.T.,* 405 Pa. Super. 156, 592 A.2d 55, 57 (Pa. Super. 1991) (citation omitted). This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In re C.R.S., supra* at 845 (citation omitted).

*In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013).

In her first issue, Mother argues that the evidence is insufficient to adjudicate the Children dependent pursuant to 42 Pa.C.S.A. § 6302. Specifically, Mother asserts that the Children are safe in her care.

The trial court reasoned as follows in its Rule 1925(a) opinion.

A.D., natural father of two of the minor children and Mother's husband, has a history of sexually inappropriate contact with minors. Aware of that history, Mother allowed A.D. to have contact with her

- 7 -

children, and one of the children, I.A.-H., was sexually targeted by A.D. Specifically, Mother was aware of Father's sexual offending history as early as 2010. Earlier this year, A.D. admitted to law enforcement that he had sexual conversations with Mother's minor child, I.A.-H. Mother herself spoke with law enforcement about Father's admissions. Despite this knowledge, Mother has asserted that she does not believe A.D. poses a risk to her children and has requested supervised visits between A.D. and his minor children. It is clear to th[e trial c]ourt that Mother is unable to appreciate the seriousness of the risk that A.D. poses to I.A.-H and the other minor children.

Trial Court Opinion, 12/12/14, at 3-4 (citations to record omitted). The testimonial evidence supports the court's findings.

Mother testified that she first became aware of A.D.'s sexual history in March 2010. N.T., 10/15/14, at 31-32. Mother testified that she was pregnant with A.D.'s child at the time.[7] *Id.* She explained as follows on cross-examination.

Q. And where did you learn [of A.D.'s history] from? Information from [BC]CYS?

A. Yes, [BC]CYS came out to the house that I was living at, at the time.

Q. So [A.D.] had never discussed his past with you; is that correct?

A. No, not at that point.

---

[7] Mother failed to clarify which child she was pregnant with; however, in March 2010, Mother was pregnant with K.D., her second child with A.D.

Q. And when you learned of his past, did you ask him: Go into more detail. Tell me everything that happened. What treatment did you get[?] All of that information.

A. He was pretty straight forward and told me that he had [an] indecent assault charge; that he was in South – he went to South Mountain; that he had finished whatever was required of him at the time and –

Q. [ ] But didn't he tell you that he had perpetrated on his own sister; that his father was a sex offender; that his brother was a sex offender?

A. Well, I found out through [BC]CYS about his father.

Q. He didn't tell you?

A. No, not right away.

Q. [A.D.] didn't tell you that he raped his sister?

A. No.

Q. You found out all of that … through [BC]CYS?

A. Yes.

Q. And that was March of 2010?

A. Uh-huh.

*Id.* at 32-33. Mother testified that BCCYS told her in 2010 that the incident leading to A.D.'s indecent assault charge occurred when he was twelve years old. *Id.* at 6.

Mother testified that, in 2010, BCCYS prohibited A.D. to have contact with her children until he was seen by a therapist, and for her to participate

in a non-offending parent evaluation at Berks Counseling Associates.[8] *Id.* at 20. Mother testified as follows.

> Q. Whatever happened in the 2010 matter? How did that end, or did it ever end?
>
> A. [A.D.] went for treatment; he complied with whatever he was supposed to do. At that time, [BC]CYS c[a]me to the house and said that they were going to close the case, and we moved on with our lives.

*Id.* at 20-21. Mother testified that BCCYS did not stay involved with her family after 2010. *Id.* at 21.

Mother testified that, in April 2014, she contacted the police upon finding that an "older gentleman," whom she further described as a "body builder guy," inappropriately communicated with I.A.-H. via Facebook. *Id.* at 8, 46. Specifically, Mother testified that she saw messages from the man to I.A.-H. stating, "Baby, I love you. Will you answer me, Baby? Baby, you're not talking to me." *Id.* at 46.

Detective Snell testified that, upon investigation, he learned that the messages were coming from the residence of A.D. *Id.* at 55. Detective Snell testified that, upon speaking with A.D., he admitted to having the inappropriate communications via Facebook with I.A.-H. under an alias

---

[8] The record includes the non-offending parenting evaluation by Berks Counseling Associates, P.C., and it is dated October 5, 2009. N.T., 10/15/14, at Exhibit 2, p. 1. At the time of the evaluation, Mother was A.D.'s paramour and was pregnant with D.D., the first of her two children with A.D. *Id.*

name, and he admitted to soliciting her to send naked pictures of herself. *Id.* at 55-56. Detective Snell testified that, upon questioning A.D. regarding whether he sent I.A.-H. the picture of the penis, A.D. "said he didn't remember if he did or didn't and became very defensive." *Id.* Detective Snell testified he told Mother that A.D. admitted to sending the communications to I.A.-H. via Facebook. *Id.* at 58. In addition, Detective Snell told Mother to report A.D.'s behavior to BCCYS. *Id.*

Mother testified that she telephoned BCCYS on May 30, 2014. *Id.* at 22. In addition, Mother testified that she asked A.D. to leave the home, where they lived with the Children and Mother's parents, "as soon as the police left the house[.]" *Id.* at 23. Mother also testified that she has not initiated a divorce action against A.D., but they do not live in the same home. *Id.* at 10-11.

Susan Bamford, the BCCYS caseworker, testified that she received a report regarding A.D.'s behavior at the end of May. *Id.* at 61. Bamford testified that she visited the family and implemented a safety plan that included prohibiting A.D. from having any contact with Mother's three older children, and supervised contact, at Mother's discretion, with D.D. and K.D. *Id.* at 62.

Significantly, Bamford testified with respect to a conversation she had with Mother regarding the risk posed by A.D., as follows.

Q. Did you have a conversation with [Mother] regarding whether [A.D.] posed any type of risk to his children?

A. I did. On my visit, we sat down at the dining room table in grandmom's house and discussed the -- this was after the preliminary hearing had taken place and he had waived the hearing. And we discussed what that was about, and we discussed that [I.A.-H.] still did not know that he was the one who had sent the picture, but mom knew who it was. And she also indicated - - we had a discussion about was she concerned for the threat to her children by [A.D.], and I specifically said physically touching them. Because he was capable of doing what he did, the next step would be [to] follow through on touching them. And [Mother] told me that she did not feel that he was any threat of touching her children.

Q. Did … you observe mom to be concerned about the photograph that had been sent, or anything like that?

A. No, she wasn't really concerned about the photograph.

…

THE WITNESS: She did indicate that, even though he had been through the preliminary hearing, that we would wait and see what happened in court.

*Id.* at 65-66.

Mother testified as follows regarding her conversation with the BCCYS caseworker and, further, about whether she believes A.D. sent the picture of the erect penis to I.A.-H.

Q. And when the [BCCYS] caseworker specifically asked if you thought [A.D.] was any risk or threat to your children, what did you say?

- 12 -

A. No.  I think it was no.

…

Q. And, now, do you question whether it was [A.D.] sending - - what did he send to your daughter?

A. Honestly, I really don't even know; nobody shown it to me

…

Q. So you have no idea, to this day, what the picture that was sent to your daughter was of?

A. Nope, never saw it.

Q. Never saw it, or you don't know what it was?

A. I mean, they say there was a picture of a man's private part, but I never saw it.

…

Q. Wasn't there a preliminary hearing?

A. It was waived.

Q. [ ] And who was charged at the preliminary hearing?

A. [A.D.] was.  But I have asked – I mean, I never, personally, saw anything, so I was just going by what they said.  Do you know what I mean?  And that's what I'm trying to wait until the court hearing to decide what my next move is with my marriage because of the – if I'm going to stay married to the man who has sent a picture to my child.  But I'm waiting for the law and all the court hearing to go

> through so I know there is a  - - there is no question
> he did it.

*Id.* at 12-14.[9]

Based on the testimony of Mother and Bamford, and the documentary evidence of record, specifically, BCCYS Exhibits 1 (A.D.'s sexuality evaluation), 2 (Mother's non-offending parent evaluation), 8 (A.D.'s criminal docket), and 9 (affidavit of probable cause in support of the charges against

_____

[9] In addition, D.K., the Children's maternal grandmother, in whose home the family lives, testified on cross-examination by counsel for BCCYS, that "I don't feel, given [A.D.'s] behaviors, his conversations, that there's been any reason for concern [of A.D. being a risk to the Children]."  N.T., 10/15/14, at 80.  Further, D.K. testified:

> Q. So the fact that [A.D.] admitted to having a
> conversation with [I.A.-H] on Facebook, that's not - -
>
> …
>
> A. Sure, that would concern me.  I just don't know
> enough about what really happened yet at this point.
>
> Q. And now you are aware, though, that someone
> with the IP address that matched up to your house
> sent [I.A.-H] messaging saying: Send me a picture
> of your vagina.  I will send you $50.
>
>    You're aware of that, correct?
>
> A. I'm aware of the report that said witnesses said
> so.  That's all I know.  And I just feel like I need to
> know more so I know how to behave from here on
> in.

*Id.* at 81-82.

A.D.), we discern no abuse of discretion by the trial court in finding that "Mother is unable to appreciate the seriousness of the risk that A.D. poses to I.A.-H. and the other minor children." Trial Court Opinion, 12/12/14, at 4. It follows that we conclude the trial court did not abuse its discretion in adjudicating the Children dependent for being "without proper parental care or control … necessary for [their] physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302.

We specifically reject Mother's contention that BCCYS did not meet its burden based on a notation in Bamford's August 29, 2014 casenote, stating that Mother and I.A.-H.'s father, R.H., "are capable of utilizing appropriate protective capacities." N.T., 10/15/14, at 70-71. In the closing argument of counsel for BCCYS, counsel argued that dependency is appropriate for the following reason.

> While we agree these children can remain at home with mom, we are asking th[e trial c]ourt to give specific, absolutely no contact with [A.D.], as well as that mom needs to cooperate with non-offender treatment so, again, that it can be made clear the signs and the things that she needs to watch for to make sure that nothing further happens to her children.

N.T., 10/15/14, at 84-85. Likewise, the GAL recommended the Children be adjudicated dependent, testifying as follows.

> I believe the children should be dependent. Mom [ ] -- and despite having gone through offender treatment to recognize when there is a predator under your roof and that her daughter was responding, I think she needs the treatment again.

- 15 -

*Id.* at 88. Based on the totality of the record evidence, we discern no abuse of discretion by the court in adjudicating the Children dependent so that Mother would participate in another non-offending parenting evaluation and cooperate with the treatment recommended, *inter alia*.

In addition, although there is no evidence in the certified record that A.D. has inappropriately communicated with or illegally solicited any of the Children other than I.A.-H., this Court has stated the following consideration in determining whether siblings are also dependent.

> [T]he focus is not on whether the other siblings are actually at risk of abuse themselves. ["]Rather, the key question is whether the siblings fit the broader definition of lacking 'proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals.'"

*In re M.W.*, 842 A.2d 425, 429 (Pa. Super. 2004); *see also In re S.B.*, 833 A.2d 1116 (Pa. Super. 2003) (concluding that, where one sibling is abused and found to be dependent, it is within the trial court's discretion to determine other siblings are dependent even if they are not abused). Here, we discern no abuse of discretion by the court in adjudicating the Children, which includes the siblings of I.A.-H., dependent. Thus, Mother's first issue fails.

In her second issue, Mother argues that the trial court erred in not dismissing the dependency petitions for failing to be served promptly pursuant to Pennsylvania Rule of Juvenile Court Procedure 1331.

### Rule 1331.  Service of Petition

**A. Copy.**  Upon the filing of a petition, a copy of the petition shall be served promptly upon the child, the child's guardian, the child's attorney, the guardian's attorney, the attorney for the county agency, and the county agency.

Pa.R.J.C.P. 1331(A).

Mother alleges that the dependency petitions were filed on August 20, 2014, but Mother was not served with the petitions until September 8, 2014. Further, Mother alleges that, during the time period between the filing of the petitions and their service, "much happened between the parties[.]  The [BC]CYS caseworker had a home visit on August 29, 2014.  Justice [W]orks would have made weekly visits to the home for inspections.  Counseling would have been ongoing.  [A.D.], the father, had his criminal preliminary hearing AND his arraignment."  Mother's Brief at 13.

Mother argues "[i]t is fundamentally unfair to allow th[e] parents to proceed in their contact with [BC]CYS without the benefit of legal counsel and without knowing that their relationship with CYS has changed."  *Id.* at 13-14.  In addition, Mother argues, "[a]llowing [BC]CYS to have the advantage to prepare for the hearing without the parents knowing that dependency was sought is fundamentally unfair."  *Id.* at 14.

Mother does not indicate that she raised this claim before the trial court, nor does our review of the record reveal that she raised it in the trial court.  It is axiomatic that claims that were not raised in the trial court may

- 17 -

not be raised for the first time on appeal. *Jahanshahi v. Centura Development Co., Inc.*, 816 A.2d 1179, 1189 (Pa. Super. 2003); *accord* Pa.R.A.P. 302(a). Thus, we conclude that Mother has not preserved this issue for appellate review. However, even if Mother did preserve this issue, we would conclude that it is without merit.

The trial court reasoned in its Rule 1925(a) opinion as follows.

> Pennsylvania Rule of Juvenile Court Procedure 1331 requires that a copy of a dependency petition be served promptly upon a child's guardian. Nothing in the rule imposes any strict timing requirements. The [trial c]ourt believes that service was prompt for the purposes of Pa.R.J.C.P. 1331. Mother was served on September 8, 2014, and counsel entered his appearance on September 12, 2014. The purpose of Pa.R.J.C.P. 1331 is to afford the parent an adequate opportunity to prepare a response to the dependency petition. Mother was afforded an opportunity to retain private counsel and granted a continuance for counsel to obtain discovery prior to the adjudicatory hearing held on October 15, 2014. Even if service was delayed as argued by Mother, the proper remedy would not have been a denial or dismissal of the dependency petitions and, thus any error would be harmless.

Trial Court Opinion, 12/12/14, at 4.

We agree with the trial court that there is no mandatory language in Rule 1331 requiring dismissal of an action for a delay in the service of a petition. Further, we agree with the trial court that, in this case, service was prompt for purposes of Rule 1331, having been made nineteen days after the petitions were filed.

Based on the foregoing, we conclude all of Mother's issues on appeal are either waived or devoid of merit. Accordingly, the trial court's October 17, 2014 orders are affirmed.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/23/2015