J-A25039-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.N. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.N., MOTHER AND | : | |
| B.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 682 WDA 2021 |

Appeal from the Order Entered May 4, 2021
In the Court of Common Pleas of Allegheny County
Family Court at No(s):  FID - 02-FN-000239-2021,
No. CP-02-DP-0000201-2021

BEFORE:   KUNSELMAN, J., KING, J., and COLINS, J.*

MEMORANDUM BY COLINS, J.:                    **FILED: JANUARY 21, 2022**

C.N. ("Mother") and B.N. ("Father") (collectively, "Parents") appeal from

the May 4, 2021 order adjudicating dependent their daughter, C.N. ("Child"),

born in January 2006, and removing her from their home.  Upon careful

review, we affirm.

The record reveals that Allegheny Office of Children, Youth and Families

("OCYF") received a referral about this family on March 14, 2021, at which

time Child was in the protective custody of the Castle Shannon Police

Department due to her allegation that her nineteen-year-old biological brother

_____

* Retired Senior Judge assigned to the Superior Court.

sexually abused her.[1]  Trial Court Opinion, 7/8/21, at 2; N.T., 5/4/21, at 5-6. Child also alleged inappropriate discipline by Parents.[2]  N.T., 5/4/21, at 5-6.

By verbal order dated March 14, 2021,[3] the trial court placed Child in the emergency protective custody of OCYF.  Child was then placed in the home of her maternal aunt.  ***Id.*** at 7.  On March 23, 2021, the court placed Child in shelter care and ordered supervised visits with Parents at Child's discretion. On March 31, 2021, OCYF filed a dependency petition.  The hearing occurred on May 4, 2021, *via* Microsoft Teams due to the COVID-19 pandemic.[4]

It is undisputed that Child's allegations of sexual abuse involve inappropriate touching that occurred for approximately two years.  Parents'

---

[1] Child's brother is employed as a firefighter and lives in Parents' home.  N.T., 5/4/21, at 27.

[2] Child testified on cross-examination that she first made the allegations against her brother and Parents in-person to her firefighter instructor.  ***Id.*** at 57-59.  Child explained that a police department was located in the same building as the fire station.  After she divulged her allegations, her instructor "went across the hall to grab a police officer. . . ."  ***Id.*** at 59.  Child testified that she was then interviewed by the police officer, who subsequently called Castle Shannon Police Department.  ***Id.***

[3] The court confirmed this order in writing and entered it on the docket on March 15, 2021.

[4] OCYF presented the testimony of Josette Pickens, the supervisor of the OCYF intake office, and Patrick Riley, who became the OCYF family services caseworker after the in-take office transferred the case at the end of March 2021.  N.T., 5/4/21, at 5, 7-8, 12.  Mother and Father testified on their own behalf.  In addition, Child, then fifteen years old, testified *in camera* in the presence of the parties' counsel.

brief at 6; OCYF brief at 4. Child testified, "it happened a lot, mainly when my parents like wouldn't be home. . . ." N.T., 5/4/21, at 48. With respect to the last time her brother allegedly sexually abused her, Child testified, "it might have been a week or two before I left." *Id.* Parents further state in their brief that Child alleged her brother touched her "over her clothes, on her 'butt, vagina and breasts.'"[5] Parents' brief at 6 (citing N.T., 5/4/21, at 5-6).

As best we can discern, a ChildLine investigation of the sexual abuse allegation was pending against Child's brother at the time of the dependency hearing. N.T., 5/4/21, at 6. A separate criminal investigation occurred involving Child's brother and was closed the day before the dependency hearing. *Id.* at 8, 21. The parties do not dispute that Child's brother will not be criminally charged.

Parents testified during the dependency hearing that Child never told them that her brother was sexually abusing her, and she never expressed fear of being alone with him. N.T., 5/4/21, at 26, 35, 40. Child confirmed that she never told Mother or Father. *Id.* at 55. She explained she never told them "because the way that — in my opinion, the way that they favor him, the different things that like I would get yelled at for but he wouldn't. . . ." *Id.* Parents testified that, had they known it, they would never have left Child

---

[5] Upon review, the testimony cited by Parents does not include the facts they assert. Rather, the testimony merely categorizes Child's allegation as "sexual abuse" and/or "sexual maltreatment." N.T., 5/4/21, at 5-6.

and their son alone together. *Id.* at 29, 39. Father further testified, "I would have done something about it myself. I would not have allowed it to go this far." *Id.* at 29.

Father and Mother testified that they do not believe Child's allegations against her brother. N.T., 5/4/21, at 28-29, 32-33, 41-42. Mother stated she believes Child "has some mental issues going on right now." *Id.* at 42. For instance, Mother testified that she found "two suicide letters in [Child's] bedroom. . . ."[6] *Id.* at 36. Despite disbelieving Child's allegations, Parents testified they will keep Child safe in their home by never leaving her alone with her brother and by participating in family therapy. *Id.* at 30, 33-34, 38-39. Parents were not questioned on direct or cross-examination whether they will require their son to move out of the house for Child's safety; however, it was undisputed during the hearing that Parents will not require it.

At the time of the dependency hearing, Child was receiving therapy. N.T., 5/4/21, at 29, 36. Mother testified, "I would like to see her get some more help than what she is getting now." *Id.* at 36. Father and Mother requested a referral for Child to have a psychiatric evaluation. *Id.* at 18, 29. Further, Mother had commenced individual therapy. *Id.* at 38. Parents were also searching for a family therapist. *Id.* at 29, 36-38.

_____

[6] Mother did not testify further about the alleged suicide letters, including, but not limited to, when she found them. In addition, Child was not questioned on this subject during her *in camera* testimony.

With respect to Child's allegation of Parents' inappropriate discipline, Child testified, "I never said that they physically laid a hand on me. I was in fear that it was going to get to that point." N.T., 5/4/21, at 59. Supervisor Pickens confirmed that Child told her "nothing physical has ever happened[,] but she is fearful of something physical" happening. *Id.* at 9. For instance, Child testified that Mother sent her "a really nasty text message. [Mother] said like she wanted me gone, she wanted me dead. . . ." *Id.* at 47. Child explained that the argument with Mother had to do with their dog who "pooped on the floor" when Child was out of the house. *Id.* at 46. Child testified that, when she returned home, Mother "said, oh, you're so done, I'm so done with you, I want you dead, I want you and this dog out of this house." *Id.*

Parents acknowledge parent/child conflict in the home. N.T., 5/4/21, at 8-9, 13. Father testified, "I do believe [Child and I] have some issues to work on. You know, we all have our problems and our issues. Especially in light of what is going on, I think all four of us need counseling and need help." *Id.* at 34. Mother testified in more detail. Specifically, she stated that Child sent text messages to her friends "on how much she hates me, how she wants to punch me in the face, she can't stand me. . . ."[7] *Id.* at 36. Mother stated, "I did not know she felt like this towards me. I mean, she always said I love you. . . . I think she needs some help or there is something going on." *Id.*

_____

[7] Mother testified that Child's text messages also displayed the same anger against Father. N.T., 5/4/21, at 36.

Further, Mother explained, "this was all a big shock to us. I did not see none of this coming, none of this coming. . . . I don't know who she is right now. I just see a lot of anger in her and madness." *Id.* at 39.

The trial court questioned Mother as follows regarding her shock over Child's feelings about Father and her in relation to her disbelief that her son had sexually abused Child.

> THE COURT: [Y]ou said that you were really shocked by some of the texts that you read on [Child]'s phone about her not liking you and wanting to punch you in the face and punch your husband, correct?
>
> THE WITNESS: Yes.
>
> THE COURT: I think you testified the day before this happened you made her a big lunch and she said she loved you and left the house; is that correct?
>
> THE WITNESS: That's correct.
>
> . . .
>
> THE COURT: You had no clue about how she felt about you until you read the texts, right?
>
> THE WITNESS: Correct.
>
> THE COURT: Could it be that you didn't see anything about what her brother was doing to her similar to you not knowing about anything until you [had] seen the text, could it be the same thing?
>
> THE WITNESS: It could be.

*Id.* at 42-44.

The record reveals that a minimum of three visits had occurred between Parents and Child by the time of the dependency hearing, which were

supervised by Child's aunt. N.T., 5/4/21, at 10, 21. The visits were difficult and short in duration. *Id.* at 10, 20. Child testified that the visits ended early because Mother "would just yell at me for the first 15 or 20 minutes, just put me down. . . ." *Id.* at 10, 48-49. Child stated, "right now I have a better relationship with my dad than I do with my mom. . . ." *Id.* at 49. She explained, "I can't talk to my mom because she will get mad and go off." *Id.* at 50.

Caseworker Riley testified that Child prefers not to return home "at this time." N.T., 5/4/21, at 13. He testified that his concern with sending Child home "would just be the parent/child conflict." *Id.* However, he subsequently testified that, because Parents do not believe their son sexually abused Child, and their son continues to reside in the home, Child cannot safely go home "at this time." *Id.* at 14-15. Caseworker Riley stated that, before Child can safely be returned home, there needs to be "some time for [P]arents and herself to be in therapy separately and together, probably some sort of in-home or homebuilders type service . . . to work toward finding out exactly . . . what occurred through the therapies and things like that." *Id.* at 15.

Child testified she did not feel safe at home "[b]ecause the way that they yelled at me, I thought it was going to get physical, at least with my mom." N.T., 5/4/21, at 46. Child also testified she does not feel safe around her brother. *Id.* at 48.

At the conclusion of the evidence, the parties' counsel presented closing arguments.[8] N.T., 5/4/21, at 60-63. The court issued its ruling on the record in open court adjudicating Child dependent and maintaining her current placement with her aunt. *Id.* at 63-64, 68. The court stated, in part:

> [Child] is telling me that she is afraid to come back to the house[,] and she won't come back to the house. I won't put her back in the house because I'm not sure what happened. Just like you two are saying that you're not one hundred percent sure either, you don't think [the sexual abuse] happened, but we really don't know. I'm not going to wind up putting her back in that situation without trying to find out first. I think there is a safety issue. I think [O]CYF can put in services for the parent/child conflict or the therapy[,] and hopefully we're going to be able to get down to the bottom of this. . . .

N.T., 5/4/21, at 63-64. Further, the court ordered, *inter alia*, (1) Child receive a mental health evaluation and follow all recommendations; (2) the family participate in parent/child conflict therapy; and (3) Parents and Child participate in supervised visitation, which, if it goes well, can become unsupervised at Child's discretion. *Id.* at 68. By order dated and entered on May 4, 2021, the court memorialized its adjudication based on lack of proper parental care or control pursuant to 42 Pa.C.S.A. § 6302(1) and its disposition maintaining Child's current placement with her aunt.

---

[8] The GAL argued that Child should be adjudicated dependent, and her safety at home could not be assured at that time. N.T., 5/4/21, at 62-63.

On June 3, 2021, Parents timely filed a notice of appeal and concise statement of errors complained of on appeal.[9] The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on July 8, 2021.

On appeal, Parents present the following issues for review:

1. Did the trial court err in inferring that the Parents' initial reluctance to discuss with OCYF staff allegations that the older brother had acted sexually inappropriately with [Child] to be a basis to find [C]hild dependent and to award custody to her maternal aunt, particularly given the [P]arents['] full cooperation with OCYF staff since that initial visit, which was sprung on them, and given [P]arents' agreement to participate in all individual or family therapy recommended by OCYF or ordered by [c]ourt?

2. Did the Commonwealth present insufficient evidence at the [a]djudicatory [h]earing to show that [Child] informed [P]arents that her older brother had been mistreating her which otherwise might demonstrate that [P]arents violated their affirmative duty to protect the child, as to render [Child] a dependent child within the ambit of 42 Pa.C.S.A. [§] 6302?

3. Did the Commonwealth present insufficient evidence at the [a]djudicatory [h]earing to show that [P]arents violated their affirmative duty to protect [Child], where [C]hild's older brother only touched her over her clothes, thus failing to show any sexual abuse so as to render [Child] a dependent child within the ambit of 42 Pa.C.S.A. [§] 6302?

4. Did the Commonwealth present insufficient evidence at the [a]djudicatory [h]earing to show that [P]arents violated their affirmative duty to protect [Child], simply due to their

_____

[9] On August 20, 2021, this Court issued a rule to show cause order because it was unclear whether Father was an appellant. Following Father's response that he intended to appeal, we ordered Parents to file an amended notice stating that the appeal is taken by Mother and Father. On September 16, 2021, Parents filed an amended notice, as directed. Thereafter, this Court changed the caption to reflect that Father is also an appellant, and we discharged the show cause order.

reluctance to make the older brother — the alleged perpetrator — available for OCYF questioning as the older brother is an adult, and therefore not within the legal control and custody of his parents, thus militating against a finding that [Child] is a dependent child within the ambit of 42 Pa.C.S.A. [§] 6302?

5. Did the Commonwealth present insufficient evidence at the [a]djudicatory [h]earing to show that [P]arents used inappropriate physical discipline upon [Child], as to render [Child] a dependent child within the ambit of 42 Pa.C.S.A. [§] 6302?

6. Did the trial court err in declining to find the dismissal of the criminal charges initially lodged against the older brother demonstrated that [P]arents did not violate their affirmative duty to protect [C]hild, as to otherwise render [Child] a dependent child within the ambit of 42 Pa.C.S.A. [§] 6302?

7. Did the fact that the ChildLine accusation initially lodged against the older brother was deemed unfounded demonstrated that [P]arents did not violate their affirmative duty to protect the child, as to render [Child] a dependent child within the ambit of 42 Pa.C.S.A. [§] 6302?

Parents' brief at 4-5.

Our standard of review for dependency cases is as follows.

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

A dependency hearing is a two-stage process governed by the Juvenile Act ("Act"), 42 Pa.C.S.A. §§ 6301-6365. This Court has explained:

The first stage requires the juvenile court to hear evidence on the dependency petition and determine whether the child is dependent pursuant to the standards set forth in section 6302. 42

- 10 -

Pa.C.S.A. § 6341(a). If the court finds clear and convincing evidence that the child is dependent, it may move to the second stage, in which it must make an appropriate disposition based upon an inquiry into the best interests of the child. 42 Pa.C.S.A. § 6351(a); *In re B.S.*, 923 A.2d 517, 521 (Pa. Super. 2007). Clear and convincing evidence is evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts at issue." *In the Matter of C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997).

To adjudicate a child dependent based upon lack of parental care or control, a juvenile court must determine that the child:

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.

42 Pa.C.S.A. § 6302(1).

In accordance with the overarching purpose of the Juvenile Act "to preserve family unity wherever possible," *see* 42 Pa.C.S.A. § 6301(b), a child will be declared dependent only when he is presently without proper parental care or control, and when such care and control are not immediately available. *In the Interest of R.T.*, 592 A.2d 55, 57 (Pa. Super. 1991). This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *C.R.S.*, 696 A.2d at 845.

*In re M.B.*, 101 A.3d 124, 127-128 (Pa. Super. 2014).

If the court finds from clear and convincing evidence that the child is dependent, then the second stage of the dependency process requires that the court make an appropriate disposition based on an inquiry into the best interests of the child pursuant to Section 6351(a) and (b). 42 Pa.C.S.A. §

6341(c); *In re B.S.*, 923 A.2d at 521. Regarding when a child should be removed from parental custody, this Court has stated:

> The law is clear that a child should be removed from her parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being. In addition, this [C]ourt had held that clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with her family are unfeasible.

*In Interest of K.B.*, 419 A.2d 508, 515 (Pa. Super. 1980) (citations omitted). In addition, we have stated, "it is not for this [C]ourt, but for the trial court as factfinder, to determine whether [a child's] removal from her family was clearly necessary." *In the Interest of S.S.*, 651 A.2d 174, 177 (Pa. Super. 1994).

Instantly, with respect to Child being dependent based upon her sexual abuse allegations against her brother, the court found:

> The court recognizes that there are many factors that can play into a family's decision to remove one of the children from the family home. However, [P]arents have remained steadfast in the belief that [Child] concocted the story. It appears that they attribute [Child]'s admissions to mental health issues. At the onset of the investigation, OCYF Supervisor, Josette Pickens, testified that she attempted to speak with [P]arents about the magnitude of the allegations and the effects on [Child]. The current caseworker, Patrick Riley, also attempted to speak to [P]arents about the allegations. It is concerning that [P]arents have been so rigid in their response to [Child]'s claims. [P]arents argue that [the] court should not have considered their reluctance to discuss the sexual abuse allegations with OCYF. This court disagrees, as it is a parent's duty to provide for their child's health, safety and well-being. Parents should take claims of sexual abuse seriously, especially when the allegation results in the child being removed from the family home. The court finds that [P]arents

have never taken the allegations seriously[,] and[,] as such, have not taken any steps to ensure [Child]'s safety in the family home.

Trial Court Opinion, 7/8/21, at 6. Based on these findings, the court concluded:

[P]arents lack the capacity to understand the seriousness of the allegations made by [Child]. Quite frankly, [P]arents have not done anything to address the circumstances surrounding the allegations. They have not made arrangements for their son to live outside of the family home, even on a temporary basis. Mother reported to having a safety plan in place in which [C]hild would have no unsupervised contact with her brother. However, the court was not satisfied that she would follow through with the plan. . . . The court finds that [P]arents simply do not have the capacity to provide for [Child]'s health, safety or welfare at this time or in the immediate future. It is clear to this court that the family needs therapeutic services to resolve the parent/child conflict and to address [Child]'s allegations of sexual abuse.

Based upon these concerns, the court found that separating [Child] from her parents was clearly necessary until such a time that her safety and well-being could be adequately assured.

Trial Court Opinion, 7/8/21, at 9-10 (citation omitted).

With respect to Child being dependent based upon the parent/child conflict, the court found:

Mother's assessment of her relationship with [Child] was markedly different than that of [C]hild. Mother reported having a calm, happy household with no issues until recently. However, [Child] reported frequent yelling and arguing in the family home. ([N.T., 5/4/21,] at 48). The court found [Child]'s testimony to be credible in her report of intense verbal altercations with Mother. The court also found it credible that [C]hild feared that these altercations would become physical. Despite being removed from [P]arents' care, the parent/child conflict was ongoing as evidenced by [Child]'s reports that her visits with [P]arents had to be cut short on each occasion. ([*Id.*]).

*Id.* at 7.

- 13 -

On appeal, Parents argue that the order of adjudication and disposition is not supported by clear and convincing evidence. The crux of their argument is that the court erred in finding unreasonable their disbelief of Child's sexual abuse allegations and not requiring their son to leave the house as result of the allegations. Nevertheless, Parents argue that they are committed to Child's safety and health, and that they can ensure her safety while their son remains in the house. Therefore, they argue that the court abused its discretion in issuing the order of adjudication and disposition.

With respect to Parents' first issue, that the court erred to the extent it based the subject order on their initial reluctance to discuss Child's allegations against her brother with OCYF, they failed to include it in the argument section of their brief. *See* Pa.R.A.P. 2119 (providing "[t]he argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part — in distinctive type or in type of distinctively displayed — the particular point treated therein, followed by such discussion and citation of the parties as are deemed pertinent"). Pa.R.A.P. 2101 underscores the seriousness with which this Court takes deviations from the procedural rules, as it permits us to quash or dismiss an appeal for procedural noncompliance. Here, we address this issue even though Parents make only passing reference to it in the argument section of their seventh and final issue. Parents' brief at 25-26.

Parents acknowledge initially being unwilling to discuss the allegations with OCYF because "they were stunned. . . . [They] needed to digest the information. . . ." Parents' brief at 26. Further, Parents assert that they subsequently discussed Child's sexual abuse allegations with OCYF. *Id.* at 25 (citing N.T., 5/4/21, at 7).

Supervisor Pickens was from the OCYF intake office which initially handled the referral, and she transferred the case to the family services unit of OCYF at the end of March 2021. In explaining OCYF's request for Child's emergency placement on March 14, 2021, Supervisor Pickens testified:

> Q. What dependency concerns [did] the agency have as it relates to [Child]. . . separate and apart from the CPS [Child Protective Services] allegations?
>
> A. The only concern that had initially presented itself was that [P]arents initially were not willing to discuss the allegations of the sexual abuse[;] therefore[,] we could not assure safety.
>
> Q. Have they agreed to or have they since discussed with you the sexual abuse allegations?
>
> A. Yes, they have.

N.T., 5/4/21, at 7. Supervisor Pickens and Caseworker Riley testified that Parents do not believe the allegations, and Parents explained their reasoning to the court. *Id.* at 9-10; 14, 17, 28-29, 32-33, 41-42.

Upon careful review, we conclude the trial court did not solely base its decision to adjudicate Child dependent and remove her from Parents' custody on their initial reluctance to discuss the sexual abuse allegations. Rather, the court considered Parents' initial reluctance as part of its overall finding that

they "have been so rigid in their response to [Child]'s claims." Trial Court Opinion, 7/8/21, at 6. In fact, the court found Parents' response does not take Child's allegations against her brother seriously. *See id.* ("The court finds that [P]arents have never taken the allegations seriously. . . ."). It follows that the court was not convinced that Parents "would follow through with the plan" to never leave Child alone with her brother. *Id.* at 9. These findings are based on the court's factual and credibility determinations in favor of Child, which are supported in the record, and we will not disturb them. *See R.J.T.*, 9 A.3d at 1190 ("[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. . . ."). We discern no abuse of discretion by the court with respect to Mother's first issue.

Related to the foregoing argument are Parents' sixth and seventh issues. Parents assert, in essence, that they reasonably disbelieve Child's allegations because of "the dismissal of the criminal charges initially lodged against [Child's] brother," and "the ChildLine accusation initially lodged against [Child's] brother was deemed unfounded. . . ." Parents' brief at 5.

Contrary to Parents' assertion, criminal charges were never lodged against Child's brother. To the extent Parents argue that the court should have weighted the lack of criminal charges in their favor, the court stated it "did not give much weight to the contention that criminal charges were not

filed against [Child]'s brother." Trial Court Opinion, 7/8/21, at 9. The court explained, "there are a number of reasons why criminal charges are and are not filed. Whether criminal charges are filed against an alleged perpetrator of sexual abuse is not a requirement to a finding of dependency. This is one of a number of factors the court considered when determining . . . [Child]'s credibility and ultimately her dependency." *Id.* We discern no abuse of the court's discretion.

In addition, contrary to Parents' assertion, as best we can discern, the ChildLine investigation was still pending at the time of the dependency hearing. N.T., 5/4/21, at 6 (Supervisor Pickens testified that the ChildLine investigation "has not been submitted to Harrisburg. We're in the final stages."). The trial court stated that the OCYF witnesses did not have "significant information about the status nor outcome of the ChildLine investigation. The court did not consider any evidence as it related to the results of the ChildLine investigation into its decision to find the child dependent." Trial Court Opinion, 7/8/21, at 8-9. We likewise discern no abuse of discretion. As such, Mother's sixth and seventh issues fail.

Turning to Parents' second issue, they assert that, because Child did not disclose her sexual abuse allegations to them, "there is no evidence to support a finding that there was 'a lack of proper parental care or control'" pursuant to Section 6302 of the Act. Parents' brief at 14. We disagree.

The trial court explained that because Child "failed to disclose sexual abuse to them does not disprove OCYF's contention that she was a dependent child. . . . The court has presided over hundreds of cases involving sexual abuse that went unreported for years. Failure to report sexual abuse is not dispositive as to whether it actually occurred. As such, this court did not consider [Child]'s failure to disclose the alleged abuse earlier." Trial Court Opinion, 7/8/21, at 8. We discern no abuse of discretion by the court regarding this issue.

In their third issue, Parents argue that Child's allegation that her brother "only touched her over clothes," even if true, does not rise to the level of sexual abuse so as to render her a dependent child under the Act. We disagree. Parents' brief at 16.

As stated above, it is undisputed that Child's allegation involves her brother inappropriately touching her; however, there is no support in the certified record that Child alleged her brother touched her "over her clothes." Assuming *arguendo* that Child's brother touched her only over her clothes, Parents assert, "the conduct becomes more ambiguous and undefined. . . . And given some ambiguity, [P]arents' reaction of disbelieving their daughter but yet ensuring her safety becomes wholly reasonable." *Id.* at 17.

The trial court reasoned that it "takes any allegation of sexual maltreatment seriously. While the conduct in question may not have risen to the level of a sexual assault, it does not negate [the] fact that [Child]'s brother

may have inappropriately touched her on numerous occasions. Parents certainly have an obligation to protect [Child] from any form of abuse in their home." Trial Court Opinion, 7/8/21, at 8. We again discern no abuse of discretion by the court in adjudicating Child dependent even if her allegations consisted of her brother touching her only over her clothes. Parents' third issue fails.

Parents argue in their fourth issue that "their reluctance to make the older brother — the alleged perpetrator — available for OCYF questioning as the older brother is an adult" does not support a finding of dependency. Parents' brief at 18. The trial court responded in its Rule 1925(a) opinion that it "did not hear any evidence that Parents precluded [Child]'s brother from speaking with OCYF during their investigation." Trial Court Opinion, 7/8/21, 8. Therefore, the court stated that it did not consider this in its determination of dependency. *Id.* We discern no abuse of discretion. Indeed, upon review, there is no testimonial evidence regarding whether Child's brother spoke to OCYF about the allegations or not.

Parents also argue in their fourth issue that they "were unfairly characterized as neglectful of their daughter because of their inability — termed as a refusal — to force their adult son to participate in police questioning and their reasonable decision not to force their son to leave the family home." Parents' brief at 20-21. In their Rule 1925(b) statement, Parents allege only that their son did not participate in OCYF questioning.

Thus, their argument involving their son not participating in police questioning is waived. *See **Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not raised in a concise statement of errors complained of an appeal is deemed waived). Parents' fourth issue fails.

Finally, in their fifth issue, Parents argue that the court erred in basing its dependency ruling "on an unsubstantiated theory that they used inappropriate physical discipline against their daughter. . . ." Parents' brief at 21. This issue is without merit. The trial court aptly stated, "there was no evidence presented by OCYF that [P]arents used any physical discipline. The only testimony that the court considered was [C]hild's fears that arguments between her and [M]other could 'become physical.' As such, this court did not consider any evidence relating to the discipline of [C]hild in reaching its decision to adjudicate [C]hild dependent." Trial Court Opinion, 5/4/21, at 8. Indeed, Parents' argument fails because the testimony of both Child and Supervisor Pickens, set forth above, is that Child never alleged that Parents physically disciplined her, but that she was afraid it would become physical, especially with Mother. N.T., 5/4/21, at 9, 46, 59. Thus, this issue fails.

In conclusion, the record supports the trial court's determination that Parents are unable "to understand the seriousness" of Child's allegations against her brother. Trial Court Opinion, 7/8/21, at 9. Based on this finding, we deem reasonable the court's legal determination that Parents "simply do

not have the capacity to provide for [Child]'s health, safety or welfare at this time or in the immediate future. . . . [S]eparating [Child] from her parents was clearly necessary until such a time that her safety and well-being could be adequately assured." ***Id.*** at 9-10. As such, the court did not abuse its discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/21/2022